57 115
87 364
57 115
93 483
57 115
117 191
118 272
57 115
e141 237

[No. 10,568.—Department Two.]

## PEOPLE *v.* A. C. IAMS.

IMMATERIAL ERROR—JURY PANEL—CRIMINAL PRACTICE. — The only object of the statute in requiring that the clerk's certificate to the list of persons drawn for jurors shall state the date of the order directing drawing, is to identify such order. *Held,* therefore, in a case where the record sufficiently identified such order, that the omission of the date from the clerk's certificate was an immaterial error.

CHALLENGE—JURY TRIAL—CRIMINAL PRACTICE.—In impaneling a jury in a criminal action, twelve names must be drawn, and the defendant may examine each separately, before challenging peremptorily, or for cause; if any be accepted, they must then be sworn, and a sufficient number drawn to complete the panel; and the same process may then be repeated, until the jury is complete.

EVIDENCE, MATERIALITY OF—MURDER.—On the trial of an indictment for murder, it appeared that a knife and piece of iron were found in the boots of the deceased, and that a witness had made some disposition of them. She was asked, on behalf of the defendant, whether she put them away of her own volition, and whether any one had directed her to do so. *Held,* that an objection to the materiality of the questions was properly sustained.

THREAT — HOMICIDE — CRIMINAL LAW. — A previous threat alone, unaccompanied with any immediate demonstration of force at the time of the rencounter, will not justify or excuse a homicide; nor will a threat have such effect, unless it has been previously communicated to the accused.

EVIDENCE — MURDER — CRIMINAL LAW. — On the trial of an indictment for murder, the defendant was asked whether any criminal intimacy had existed between himself and the wife of the deceased; *held,* that the question was immaterial.

ID.—CHARACTER.—On such trial, if the defense introduce evidence respecting the character of the deceased, it is proper for the prosecution to introduce evidence in answer thereto.

INSTRUCTION—HOMICIDE.—An instruction referred to in opinion held to correctly state the law of homicide.

APPEAL from a judgment of conviction, and an order denying a new trial, in the Superior Court of the County of Monterey. ALEXANDER, J.

The following is the instruction referred to in the opinion:

" The defendant Iams is charged, by the information filed in this Court against him, on the 15th day of May, A. D. 1880, with the crime of murder, alleged to have been committed in the county of Monterey, by willfully, feloniously, and of his malice aforethought, killing and murdering one George Mattart, on the 22nd day of April, A. D. 1880. Murder is defined by our statute to be the unlawful killing of a human being with malice aforethought. Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied where no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

" All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree, and all other kinds of murder are of the second degree.

" Under the information in this case, the defendant may, if the evidence warrant it, be convicted of manslaughter; this is defined by our statute to be the unlawful killing of a human being without malice, and is of two kinds. First, voluntary, upon a sudden quarrel or heat of passion; and second, involuntary, in the commission of an unlawful act, not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. To reduce a felonious homicide from the grade of murder to that of manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of such a character as would be naturally calculated to excite and arouse the passions, and it must appear that the party acted under the smart of this sudden passion and resentment. In such a case, the law, commiserating the frailty of human nature, withdraws the offense from the higher class in which malice and deliberation characterizes the act, and tempers its judgment accordingly. If, however, the provocation was of a slight and trifling character, of such a nature as would not be calculated to rouse the passion,

or if sufficient time had elapsed, between the provocation given and the fatal blow, for passion to subside and reason to resume its empire, the offense will not be mitigated, but the slayer will be guilty of murder.

"In this case it is not claimed by the prosecution that the homicide charged was committed in the perpetration, or attempt to perpetrate any other felony; but it is claimed that it is murder in the first degree, as being unlawful, malicious, willful, deliberate, and premeditated. In this class of cases the Legislature leaves the jury to determine, from all the evidence before them, the degree of the time, but prescribes for the government of their deliberations the same test, which is, Is the killing willful, deliberate, and premeditated? The unlawful killing must be accompanied with a deliberate and clear intent to take life, in order to constitute murder in the first degree. The intent to kill must be the result of deliberate premeditation. It must be formed upon a pre-existing reflection, and not upon a sudden heat of passion, sufficient to preclude the idea of deliberation.

"There need be no appreciable space of time between the intention to kill and the act of killing—they may be as instantaneous as successive thoughts of the mind. It is only necessary that the act of killing be preceded by a concurrence of will, deliberation, and premeditation on the part of the slayer; and if such is the case, the killing is murder in the first degree, no matter how rapidly these acts of the mind may succeed each other, or how quickly they may be followed by the act of killing.

"From these definitions, the jury will see that any unlawful killing of a human being, with malice aforethought, is murder; but if nothing further characterizes the offense, it is murder of the second degree; to constitute the higher offense, there must be superadded to the general definition above given, willfulness, deliberation, and premeditation. By willfulness is meant that it was of purpose, with the intent, that, by the given act, the life of the party should be taken. It must be deliberate and premeditated. By this, it is not meant that the killing must have been conceived or intended for any particular length of time. It is sufficient if it was done with reflection, and conceived be-

forehand; and in this view, as I have said before, the deliberate purpose to kill and the killing may follow each other as rapidly as successive impulses or thoughts of the mind. It is enough that the party deliberate before the act—premeditate the purpose to slay before he gave the fatal blow. But while the purpose, the intent, and its execution may follow thus rapidly upon each other, it is proper for the jury to take into consideration the shortness of such interval in considering whether such sudden and speedy execution may not be attributed to sudden passion and anger, rather than to deliberation and premeditation, which must characterize the higher offense. From what I have said, you will see that the distinction between the two grades of offense is, that in murder of the first degree (unless it was committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem), the killing must be deliberate and premeditated; whilst in murder of the second degree, the killing is not deliberate or premeditated. In the one case, there is a deliberate, premeditated, preconceived design, though it may have been formed in the mind immediately before the mortal wound was given, to take life. In the other case, there is no deliberation, premeditation, or preconceived design to kill.

" In both, however, the killing must have been unlawful, and accompanied with malice.

"In the present case, it is not denied by the defendant that he fired the shot by which the deceased was slain; but he claims that it was in necessary self-defense, and to repel a violent and dangerous attack which the deceased was then making, or was about to make upon him. The right of self-defense of a party violently assaulted by another, to repel such attack and fully protect himself, is a law of nature. It antedates all written enactments, and is fully recognized in the laws and regulations of all civilized people. The right is expressly recognized by our own statutes, and the conditions under which it may be asserted are clearly defined. These are, that the party was not himself the first aggressor; or if the aggressor, that he had in good faith withdrawn from the contest before the fatal blow. Second, that the slaying was necessary to prevent the infliction upon himself of a great bodily injury by the party slain.

" To justify the killing of another in self-defense, it must appear that the danger was so urgent and pressing, that, in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary, and it must appear that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline further struggle before the mortal blow was given.

" A bare fear of the commission of the offense, to prevent which a homicide may lawfully be committed, is not sufficient to justify it; but the circumstances must be sufficient to excite the fears of a reasonable man, and the party killing must have acted under the influence of such fears alone. It is not necessary, however, to justify such killing, that the danger be actual. It is enough that it be an apparent danger: such an appearance as would induce a reasonable person in defendant's position to believe that he was in immediate danger of great bodily injury. Upon such appearances, a party may act with safety; nor will he be held accountable, though it should afterwards appear that the indications upon which he acted were wholly fallacious, and that he was in no actual peril.

" The rule in such cases is this, What would a reasonable person—a person of ordinary caution, judgment, and observation—in the position of the defendant, seeing what he saw, and knowing what he knew, supposed from this situation and these surroundings? If such reasonable person so placed would have been justified in believing himself in imminent danger, then the defendant would be justified in believing himself in such peril, and acting upon such appearances. The defendant is not necessarily justified, because he actually believed that he was in imminent danger. When the danger is only apparent, and not actual and real, the question is, Would a reasonable man, under all the circumstances, be justified in such belief? If so, the defendant will be so justified. If this was defendant's position, it was his right to repel the aggression, and fully protect himself from such apparent danger. If he could have withdrawn from the danger, it was his duty to retreat. Between his duty to flee and his right to kill, he must fly; or, as the books have it, must retreat to the wall. But by this is not meant that a party must always fly, or even attempt flight.

The circumstances of the attack may be such, the weapon with which he is menaced of such a character, that retreat might well increase his peril. By ' retreating to the wall ' is only meant, that the party must avail himself of any apparent and reasonable avenues of escape by which his danger might be averted, and the necessity of slaying his assailant avoided.

" But if the attack is of such a nature, the weapon of such a character, that to attempt a retreat might increase the danger, the party need retreat no farther.

" These definitions and interpretations of the law of self-defense are general rules that are to be applied by the jury to the situa- .tions and conduct of both the defendant and the deceased, as they shall determine that position and conduct to have been from the evidence in this cause.

" Mere words of insult or of reproach, however grievous, will not justify an assault, a blow, or a threatening demonstration with a deadly weapon.

" But while mere words will not justify an assault, they may possess significance, as illustrating or explaining the subsequent acts of the parties, and determining who is the first aggressor, especially if threats or menacing expressions are uttered. Leaving out of consideration the mere words of reproach as constituting no excuse or justification for an assault, which of these parties was the aggressor? Which made the first shot? If from the evidence you believe, that, without any overt act, or physical demonstration upon the part of the deceased, sufficient to warrant the defendant as a reasonable man in believing that he was in great bodily danger, he, the defendant, fired the fatal shot at the deceased, and killed him, such killing under such circumstances was not justifiable.

" Upon the other hand, if you believe that the deceased himself made the first hostile demonstration against the defendant, by drawing or attempting to draw his weapon, or otherwise assaulting him in such a manner and under such circumstances as would have justified a reasonable man in defendant's situation in believing that the deceased was about to inflict upon defendant great bodily injury, the defendant was justified in acting upon these appearances and belief; and if necessary for his own protection, and to prevent great bodily injury to him-

self, he fired the fatal shot, he was justified in so doing, and your verdict should be one of acquittal.

" In every crime or public offense, there must exist a union or joint operation of act and intent, or criminal negligence ; but when the act committed by the accused is of itself an unlawful act, the law in the first instance presumes the criminal intent, and the onus or burden of proof falls upon the defendant, to show the absence of criminal intent.   In this case, if you find from the evidence that the defendant fired the fatal shot, then the burden of proving the circumstances of mitigation, or that justify or excuse the homicide, devolves upon the defendant, unless the proof upon the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.

" The law presumes every man to be innocent until his guilt is established beyond any reasonable doubt, and this presumption attaches at every stage of the case, and to every fact essential to a conviction.   But, by a reasonable doubt is not meant every possible or fanciful conjecture that may be suggested.   Everything relating to human affairs, and depending upon moral evidence, is open to some fanciful doubt or conjecture.   By a reasonable doubt is meant, that state of the case, which, after an entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.

" Under the information in this case, the jury may, if the evidence warrant it, find the defendant guilty of ·murder in the first degree, murder in the second degree, or manslaughter. Should the jury entertain a reasonable doubt as to which of the grades of crime named the defendant may be guilty of, if any, they will give the defendant the benefit of such doubt, and acquit him of the higher offense.

" Witnesses have testified before you as to threats made by the deceased against the life of the defendant.

" This evidence, if credited by you, may be applied to two distinct and independent propositions.

" 1. As tending to show that the deceased was the first aggressor ; it being more probable that a person who had made

violent and vindictive threats against another would be more likely, when opportunity offered, to make an attack for the purpose of carrying them into execution than would a party who had made no threats and expressed no such purpose.

"2. That if such threats were made, and the fact that they were so made was communicated to the defendant, he might be justified in acting with more promptitude in his own defense, and upon a less dangerous or violent demonstration, when dealing with a person whom he knew had threatened his life, than the case of a party who had made no such threats.

"Evidence has been introduced as to the former good character of the defendent.

"This is to be taken into consideration by the jury, as one of the circumstances of the case, and as tending to illustrate or explain the circumstances attending the homicide, and tending to show who was the first aggressor, and who provoked this conflict. It being less probable and less reasonable that a man of a former quiet and peaceable character would invite a contest, or make an unprovoked and violent attack upon another, than that a quarrelsome, violent, and vicious person would so do.

"Evidence has been introduced before you of the character of the deceased, and tending to show that he was a violent, quarrelsome, and dangerous man. This was not admitted as tending in any way to justify his slaying by the defendant. A party has no more right to slay a bad man than a good one: both are equally protected under the law. The unwarranted slaying of either is equally a crime. The evidence of bad character is to be considered by the jury only as a circumstance illustrating the facts of the homicide, and indicating the aggressor and the nature of the aggression; it being more probable that a man of violent and dangerous character would make an unprovoked and deadly assault than that a quiet and peaceable man would so do.

"The jury are the sole judges of the evidence in the case. It is for them alone to judge of the credibility of the witnesses, of the weight to be given to the evidence, and of its effect and conclusiveness to establish any fact for which it was offered.

"In so doing, they may consider the character and appear-

ance of the witnesses, the consistency and reasonableness of their statements; and from these and such reasons as may have appeared to the jury upon the case presented, may judge and determine as to the credibility, weight, effect, and sufficiency of such testimony.

"The defendant has been examined as a witness upon his own behalf. This it is his right to be, and the jury will consider his testimony as they will that of any other witness examined before you.

"It is proper, however, for the jury to bear in mind the situation of the defendant, the manner in which he may be affected by your verdict, and the very grave interest he must feel in it; and it is proper for the jury to consider whether this position and interest may not affect his credibility or color his testimony.

"Should your verdict be one of conviction, it should designate the grade of the offense found.

"Should your verdict be conviction of murder in the first degree, the statute permits the jury to award the penalty. This may be death, or imprisonment for life in the State prison. Should the jury find the defendant guilty of murder in the first degree, without affixing the penalty, the law in such cases adjudges the penalty, and that penalty is death.

"In thus apportioning, the law-makers have assumed that homicide of the same general nature may be characterized by different degrees of atrocity, and have left the severe penalty to be applied to the higher offense, in the sound and discriminating judgment of the jury.

"Should your verdict be one of conviction, you should state the degree of the offense of which you convict. Should your verdict be one of acquittal, you will simply say: We, the jury, find the defendant not guilty."

*William H. Webb*, and *James A. Wall*, for Appellant.

*A. L. Hart*, Attorney-General, for Respondent.

MORRISON, C. J.:

An information was filed by the district attorney in the Superior Court of Monterey County, charging the defendant with

the crime of murder, and the trial resulted in a conviction of the crime of manslaughter. On the appeal, several errors are assigned to the proceedings in the Court below, which we will consider in this opinion:

1. The first objection taken by the defendant on the trial was in the form of a challenge to the panel of trial jurors drawn to serve at the July session of the Superior Court of Monterey County. It was claimed that there was a substantial departure from the form prescribed by the statute in respect to the drawing of the jury, in this: that the clerk failed, in his certificate, which was attached to the list of jurors drawn, to state the date of the order directing such drawing.

Section 219 of the Code of Civil Procedure provides, that, "after the drawing shall be completed, the clerk shall make a copy of the list of names of the persons so drawn, and certify the same. In his certificate he shall state the date of the order and of the drawing, and the number of jurors drawn, and the time when and the place where such jurors are required to appear. Such certificate and list shall be delivered to the sheriff for service." The order itself was introduced in evidence, from which it appears that it was properly made and entered on Tuesday, June 15th, 1880.

The only purpose which could be subserved by incorporating in the clerk's certificate the date of the order would be the identification of it. The Code does not require that it shall be made any given number of days before the session of the Court, or at any stated time before the jurors shall be required. Section 214 of the same Code provides, that, "whenever the business of the Superior Court shall require the attendance of a trial jury for the trial of criminal cases, * * * and no jury is in attendance, the Court may make an order, directing a trial jury to be drawn and summoned to attend before said Court"; and the succeeding section provides, that "immediately upon the order mentioned in the preceding section being made, the clerk shall, in the presence of the Court, proceed to draw the jurors from the jury box."

It appears from the transcript, that the order was made on the 15th day of June, and it further appears that the drawing took place on that day. The proceedings were in all respects

regular, and in accordance with the provisions of the Code. We are, therefore, of the opinion that the mere omission of the clerk to insert in his certificate the date of the order was not a fatal one, and therefore the Court below committed no error in denying defendant's challenge to the panel of trial jurors.

· 2. The second point made on this appeal is, that the Court erred in the mode pursued by it in selecting a jury. It was claimed on the trial, that it was defendant's right to have twelve jurors in the box, before he should be at any time required to exercise his right to challenge a juror, either peremptorily or for cause. This question has been passed upon twice by the Supreme Court, and both times adversely to the position now taken on this appeal. In the case of the *People* v. *Scoggins*, 37 Cal. 676, Mr. Justice Crockett examines the provisions of the statute relating to the selection of jurors in both civil and criminal cases, and after clearly defining the method to be pursued in each case, he says: "In order to avoid all misconstruction on this important point of practice, we repeat, that in a criminal action twelve names must be drawn from the jury box, and the defendant may examine each separately, and exhaust his challenges for cause, before challenging any one peremptorily. If he should accept say six, and challenge six, those accepted must then be sworn, and six additional names must be drawn and presented for examination, with which the same process should be repeated, and so continued until the jury is complete. In the more recent case of *The People* v. *Russell*, 46 Cal. 121, the same Court says: "The first ground of error relied upon is, that the Court erred in requiring the defendant to exercise his right of peremptory challenge prematurely, and before twelve jurors had been procured whom the Court decided to be competent and qualified. But the action of the Court was in strict accordance with the ruling of this Court in *People* v. *Scoggins*, 37 Cal. 676, and was correct, unless that case is to be now overruled. After a careful consideration of the question, we adhere to the ruling in that case as to the method to be pursued in impaneling a jury in a criminal action." These cases settle this question of practice, and we adhere to the rule laid down by them.

3. The third point presented on this appeal is, that the Court

erred in sustaining certain objections to the testimony of Mrs. Susie Mattart, the widow of the deceased. It appears from the evidence that a knife and piece of iron were found in the boots of the deceased when his boots were taken off, which knife and piece of iron the witness made some disposition of. She was asked: " Did you put them away of your own volition?" To this question an objection was made by the district attorney, and the objection was sustained by the Court. She was also asked: " If any one directed her to put them away?" and to this question an objection was interposed on behalf of the people, which was also sustained. We are of the opinion that the inquiry was an immaterial one, and cannot see how the defendant was prejudiced by the action of the Court. If the question had elicited the reply that the knife and piece of iron were put away by the direction of the deceased, we cannot see how that fact would have been of any benefit to the defense.

4. The homicide was admitted, but there was a plea of justification. It was claimed on behalf of the accused, that the deceased had made threats against the life of the accused. Indeed, this fact was fully established by the dying declaration of the deceased, which was as follows:

" April 22nd, 1880.

" I feel I may die soon, and cannot die till I have told the truth. I told those men I had never threatened his life or packed a knife. I have, and feel now without a just cause, and may God forgive me for all.          GEO. W. MATTART."

This sufficiently proved the threats.

But are mere threats sufficient to justify a homicide in any case? In case of the *The People* v. *Scoggins*, 37 Cal. 676, the Court says: " If the threats of the deceased had been communicated to the defendant before the killing, the evidence would have been clearly competent. A person whose life has been threatened by another, whom he knows or has reason to believe has armed himself with a deadly weapon, for the avowed purpose of taking his life or inflicting a great personal injury upon him, may reasonably infer, when a hostile meeting occurs, that his adversary intends to carry his threats into execution. The previous threats alone, however, unless coupled at the time with an apparant design then and there to carry them into

effect, will not justify a deadly assault by the other party.
There must be such a demonstration of an immediate intention
to execute the threat as to induce a reasonable belief that the
party threatened will lose his life or suffer serious bodily in-
jury, unless he immediately defends himself against the attack
of his adversary. The philosophy of the law on this point is
sufficiently plain. A previous threat alone, and unaccompanied
by any immediate demonstration of force at the time of the ren-
counter, will not justify or excuse an assault, because it may be
that the party making the threat has relented, or abandoned his
purpose, or his courage may have failed, or the threat may
have been only idle gasconade, made without any purpose to
execute it."

It is also true, as a general rule, that the threat must have
been communicated to the accused, otherwise it could not in any
manner have influenced his conduct. The Supreme Court says,
in the case of *The People* v. *Arnold*, 15 Cal. 481: "It is clear
that the mere fact that one man threatens to kill another is no
sort of justification to the latter to kill the former. The threats
must be shown to have been communicated to the accused be-
fore they are admissible for any purpose. *   *   *   But when
a rencounter occurs between two persons, one of whom is killed,
and the witnesses to the difficulty differ, or the circumstances
are equivocal as to which one of the two commenced the affray,
then the fact that one of the parties had previously procured a
weapon for the avowed purpose of using it against the other—
the weapon being found at the place of the affray—is a circum-
stance tending to show that the purpose was fulfilled, and hence
is proper for the consideration of the jury."

We will now look at the evidence for the purpose of deter-
mining whether the facts of the case were such as to make the
evidence of the threats of the deceased material, even if the
same had been communicated to the accused before the homi-
cide.

John Campbell, a witness sworn on behalf of the prosecution,
testified that he was present and witnessed the shooting—was
within fifteen or twenty feet of the parties, and could see them
plainly. "I heard the deceased and defendant talking. I stood
up and looked at them. Heard the defendant say to deceased,

to come out with whatever he had. Mattart (the deceased) told him he had nothing to come with except a pocket-knife. Mattart was *holding an armful of wood* at that time. Defendant then had his pistol in his hand.    *    *    *    Defendent then told Mattart to look out, and Mattart then threw his armful of wood down, and threw up his arms, standing still, and telling the defendant to shoot if he wanted to. Defendant immediately fired three shots at the deceased. At the first shot, Mattart doubled up and turned towards the house—turned around, like; when the second shot was fired at him, he was kind of turning around, kind of doubled up. The three shots struck him before he got turned around. They were fired very quickly. The deceased stood facing the defendant, about eleven feet from him, and made no perceptible advance on the defendant. I did not see the deceased have any weapon or arms of any kind."

. W. M. Kent testified that he got a horse to ride for a physician which he, the witness, let the defendant have. Witness got another horse, and caught up with defendant before he reached Salinas. The defendant turned in the saddle, and said to witness, " I expect they will punish me like hell for this."

Louis Meyer was present, and saw the defendant kill George Mattart. His evidence is substantially the same as that of the first witness.

A. Higbia testified substantially to the same facts, as do also A. Blood and Daniel Reagan.

But leaving out of view the strong and concurrent testimony of all these witnesses, who were very near the scene of the homicide, and saw everything that occurred, and accepting the evidence of the defendant himself as the truth, and we have then a case which presents no circumstances of justification. The defendant was asked :

" Q. Did Mattart, on that occasion—the occasion of the shooting—make any effort to draw a pistol or a knife, or anything else, before you shot him ?

" A. Not that I seen

" Q. During the firing of these three shots, did Mattart make any perceptible advance towards you ?

" A. I don't think he did. I can't say exactly how he held his hands, but he did not hold them up as testified to by Campbell and others.

" Q. What reason had you to suppose that he would draw anything on you, when he had made no demonstration of drawing any weapon on you?

" A. I was well satisfied that he had the weapon.

" Q. Did you see it on his person?

" A. Not at that time.

" Q. Did you see him make any effort to go to his boots to draw that knife or anything else?

" A. No, sir; he had not very much of a chance, because pretty quick after he threw his wood, I had my pistol in my hand, and I suppose the reason he did not go after his weapon was because he was afraid to."

This is enough of the evidence of the defendant to show that he was in no peril of life, or danger of serious bodily injury, at the time he did the shooting. The deceased was not in a condition to injure the defendant at the time he was approached by the defendant. He then had, as all the evidence shows, *his arms full of wood.* The difficulty was not begun by the deceased; but, on the contrary, the defendant was the aggressor throughout, and by his own conduct invited a difficulty with the deceased. There is, therefore, not the shadow of legal, justifiable self-defense in the case. Indeed, the verdict of the jury was a most lenient one, and was tempered with a great degree of mercy; for certainly the evidence would have justified a conviction of a higher crime.

5. The defendant, in the course of his examination, was asked if any criminal intimacy had ever existed between him and the wife of the deceased. Objection was made to the question, and the objection was sustained by the Court. We do not see how the inquiry could have affected the question of guilt or innocence of the accused, and there was no error in the ruling of the Court on that question.

6. There is but one other point in the case (independent of the instructions) which we deem it necessary to notice, and that is, the objection made to evidence offered by the prosecution respecting the character of the deceased. It is a sufficient answer to this objection to state, that the character of the deceased was first put in issue by the defendant, and it was in answer to such inquiry that the testimony on this point was in-

troduced by the prosecution. There was, therefore, no error in allowing the evidence to go in.

7. The last point involves the correctness of the charge of the Court, and the instructions to the jury. We have examined that part of the transcript with great care, and are obliged to say, in justice to the learned judge who presided at the trial, that the charge to the jury is a very clear and able statement of the law of homicide. It is a long charge, completely covering all the points in the case, and is, in our opinion, entirely correct.

We find no error in the proceedings which demands, or which would justify, a reversal. The judgment-and-order are-therefore affirmed.

MYRICK, J., and SHARPSTEIN, J., concurred.