[Crim. No. 211.   In Bank.—May 27, 1897.]

THE PEOPLE, RESPONDENT, *v.* FRANK A. LEWIS APPELLANT.

CRIMINAL LAW—HOMICIDE—SELF-DEFENSE—REASONABLE BELIEF OF BODILY DANGER — APPLICABILITY OF INSTRUCTION.— Upon the trial of a defendant accused of murder, where self-defense is relied upon as justifying the homicide, and there is some evidence which, if accepted by the jurors, leaves it for them to decide whether the conduct of the deceased justified the homicide or not, an instruction that, if, from the evidence, the jury believes that without any overt act or physical demonstration upon the part of the deceased sufficient to warrant the defendant as a reasonable man, in believing that he was in great bodily danger, the defendant fired the fatal shot at the deceased and killed him, such killing, under such circumstances, was not justifiable, is properly given, as applicable and pertinent to one theory of the evidence.

ID.—WRONGFUL ASSAULT—RULE AS TO FLIGHT—TENDENCY OF AMERICAN MIND.—The tendency of the American mind is against the enforcement of any rule which requires a person to flee when wrongfully assailed, to avoid chastisement, or even to save human life; and it seems that a true man, who is without fault, is not obliged to flee from an assailant who, by violence or surprise, maliciously seeks to take his life or to do him enormous bodily harm.

ID.—ASSAULT COMMITTED UPON ONE'S OWN PREMISES — RIGHT TO STAND GROUND AND TAKE LIFE.—A person assailed in his own house, or upon his own premises, has the right to stand his ground, and is not bound to retreat or escape to avoid the assailant, but may kill him if reasonably necessary for his protection from great bodily danger in the position rightfully occupied by him on his own premises, even though he might avoid the assault by fleeing or withdrawing therefrom.

ID.—ASSAULT UPON DEFENDANT IN DOOR OF HIS HOUSE—ERRONEOUS IN-
STRUCTION AS TO DUTY TO FLEE.—Where the evidence for the defense
showed that the defendant was standing inside the door of his own house,
and that deceased, who had previously threatened to kill him, was
brandishing an iron-bound singletree, with which he advanced, threat-
ening to beat out the brains of defendant, when the fatal shot was fired,
an instruction that "if he could have withdrawn from the danger it was
his duty to retreat," and that, "between his duty to flee and his right
to kill, he must fly, or, as the books have it, he must retreat to the
wall," is prejudicially erroneous.

APPEAL from a judgment of the Superior Court of
Shasta County and from an order denying a new trial.
EDWARD SWEENEY, Judge.

The facts are stated in the opinion of the court.

*Clay W. Taylor,* and *J. Chadbourne,* for Appellant.

The court erred in instructing the jury that it was the
duty of the defendant to retreat if he could have with-
drawn from the danger. (*Beard* v. *United States,* 158
U. S. 550, and cases cited; *State* v. *Cushing,* 14 Wash.
527; 53 Am. St. Rep. 883; *Willis* v. *State,* 43 Neb. 102;
*Page* v. *State,* 141 Ind. 236; *State* v. *O'Brien,* 18 Mont. 1.)

*W. F. Fitzgerald, Attorney General,* and *Charles H.
Jackson, Deputy Attorney General,* for Respondent.

The instructions, as a whole, were correct, and the
part objected to has been expressly sanctioned by this
court. (*People* v. *Iams,* 57 Cal. 118–20; *People* v. *Hecker,*
109 Cal. 463; *People* v. *Flanagan,* 60 Cal. 3; 44 Am. Rep.
52; *People* v. *Dunne,* 80 Cal. 34.)

HENSHAW, J.—The defendant was prosecuted for the
murder of William H. Farrell, and was convicted of
manslaughter. He appeals from the judgment, and
from the order denying him a new trial.

Defendant was the husband of Farrell's sister, and,
with his wife and nine-years'-old son, was living upon
a mountain ranch in Shasta county. Farrell, though he
was a not infrequent visitor at his brother-in-law's
house, was ill-disposed toward him. His grievance was
founded upon a claim of moneys due him from Lewis
for services, and there is much evidence of oft-repeated

threats upon his part, couched in most abusive language, "to maul Lewis," "to stamp his God damned guts out," "to fix him," and "to kill Lewis, or Lewis would kill him." Some of these threats had been uttered to defendant himself, in the presence of his wife. Others had been communicated to him. Farrell was the younger, stronger, and more active of the two.

Upon the day before the homicide Farrell, stopping at defendant's home, told his sister that one John Miller, at a rodeo, had recently said in his presence, and in the presence of others, that Frank Lewis had stolen his hogs, and had stolen the salt to salt them with. Farrell had then left the house, and gone on to spend the night with one William Wagner, a boy of seventeen years, who was camping a short distance away from defendant's home.

Wagner broke camp the following morning, and, by previous arrangement with defendant, brought his camping utensils for storage to Lewis' house. He was accompanied by Farrell. The two arrived shortly before 8 o'clock in the morning, and were hospitably received by Mr. and Mrs. Lewis. They had delayed breakfast for them and invited them to the meal. The young men, however, had eaten their breakfast before breaking camp, and so declined the invitation, and sat down in the door of the front room of the house, while the Lewis family went to their morning meal in the kitchen. Farrell and Wagner both carried rifles. Lewis had taken Wagner's rifle while helping him to dismount and unpack, and had placed it in the kitchen. Farrell put his rifle inside the door, near the threshold, of which he was sitting. An open door between the room in which the young men sat and the kitchen where the family were at breakfast permitted conversation. At the table were the Lewises, husband, wife, and son, and Dan Nichols, a half-breed Indian boy, nine years old.

The Lewises asked young Wagner if he had been at the rodeo, and had heard Miller charge Lewis with the theft of his hogs. Wagner replied that he had been at

the rodeo, but had not heard Miller's accusation. Either Mr. or Mrs. Lewis then asked Farrell who beside himself had heard it. He answered, giving several names, and wanted to know if his word was doubted, and if his word was not good enough for Lewis. Lewis replied that of course Farrell's word was good, but he wanted to have some one else corroborate it, so that when he went for Miller, if Miller should deny it, it would not rest simply upon Farrell's statement against Miller's. Farrell became angry, and began to abuse Lewis, saying he was not big enough to dispute his word; if he wanted to dispute his word, to come out and settle. Lewis answered that he did not have to come out, and Farrell retorted that he would make him. Lewis then said he wanted no trouble, and Farrell replied that he was going to have trouble. Lewis arose from the breakfast table and passed into the front room. As he did so, Farrell stepped out of the front door and picked up an iron bound singletree. Lewis stopped in the front door and told Farrell to leave the ranch, that he wanted no trouble. Farrell replied that he would not leave, and could not be put off, and challenged Lewis to come out. Lewis asked what he meant to do with the singletree, and Farrell replied that he would show him. Then, according to the testimony of Wagner, Lewis picked up Farrell's rifle standing inside the door, and saying: "Damn you, I will learn you to fight me," fired, and Farrell, who was standing eight or ten feet away, fell to the ground. According to the testimony of Mr. and Mrs. Lewis, Farrell, when asked the last time what he meant to do with the singletree, said: "I will beat your brains out, you damned son of a bitch; I will beat your brains out," and advanced upon Lewis with the weapon raised. Lewis seized the rifle and fired when Farrell was nearly or actually within striking distance. Farrell "swung around," dropped the singletree, recovered himself and came into the house, calling upon Wagner to give him his gun. Lewis left the house. Farrell seized Wagner's rifle,

which was in the kitchen. Mrs. Lewis struggled with him for its possession. Farrell visibly and speedily weakened from his wound, and finally ceased the struggle and was put to bed by his sister. Wagner and the Indian boy were sent for assistance. Mrs. Lewis went out to meet her husband, leaving her own little boy to attend his uncle. While she was gone, Farrell, with his pocket knife, cut his own throat.

He had been shot in the abdomen, the bullet passing through the intestines, severing the mesenteric artery and lodging in the hip bone. The wound was mortal and of a nature to cause intense suffering.

The court instructed the jury in the following language: "If from the evidence you believe that, without any overt act or physical demonstration upon the part of the deceased sufficient to warrant the defendant, as a reasonable man, in believing that he was in great bodily danger, he, the defendant, fired the fatal shot at the deceased and killed him, such killing under such circumstances was not justifiable."

Complaint is made of this, not as embodying any erroneous proposition of law, but as being foreign to any reasonable theory which might be taken of the evidence. But by the testimony of Wagner, Farrell was shot and fell ten feet away from the front door in which Lewis was standing. The latter picked up the gun, aimed and fired, saying: "Damn you, I will learn you to fight me." If this evidence was accepted by the jurors it remained for them to decide whether Farrell's conduct was such as to justify the defendant, under subdivisions 2 and 3 of section 197 of the Penal Code. The instruction was, therefore, pertinent.

Upon the law of self-defense the court instructed the jury as follows: "The defendant is not necessarily justified because he actually believed that he was in imminent danger. When the danger is only apparent, and not actual and real, the question is: Would a reasonable man, under all the circumstances, be justified in such belief? If so, the defendant will be so justified. If this

was defendant's position it was his right to repel the aggression, and fully protect himself from such apparent danger. *If he could have withdrawn from the danger it was his duty to retreat. Between his duty to flee and his right to kill, he must fly, or, as the books have it, must retreat to the wall.* But by this is not meant that a party must always fly, or even attempt flight. The circumstances of the attack may be such, the weapon with which he is menaced of such a character, that retreat might well increase his peril. By 'retreating to the wall' is only meant that the party must avail himself of any apparent and reasonable avenues of escape by which his danger might be averted, and the necessity of slaying his assailant avoided. If the attack is of such a nature, the weapon of such a character, that to attempt a retreat might increase the danger, the party need retreat no further."

Appellant especially complains of the italicized language. Respondent shows that this is an exact quotation from an instruction approved in *People* v. *Iams*, 57 Cal. 115; but in *People* v. *Williams*, 73 Cal. 531, this court in Bank said that while the whole charge of the court in *People* v. *Iams, supra*, was approved, but a small part of it was really under consideration, and as to the rest the declaration was *obiter*, and that while the charge upon the whole was an able resume of the law, portions of the charge, if isolated, would require qualification.

In *People* v. *Hecker*, 109 Cal. 451, where the right of self-defense is considered at some length, it is pointed out that our law nowhere imposes the duty of retreat upon one who without fault himself is exposed to a sudden felonious attack, and that the duty of withdrawal or retreat is imposed upon him alone who is the first aggressor, or has joined in a mutual combat, and it is further said that while at common law there was a contrariety of opinion upon the part of the writers as to the duty of retreat, which contrariety has found its way into the differing decisions of our state courts, this state has upheld a defendant's right to stand his ground

and meet by force a sudden and violent attack. "So that while the killing must be under an absolute necessity, actual or apparent, *as a matter of law* that necessity is deemed to exist when an innocent person is placed in such sudden jeopardy. The right to stand one's ground should form an element of the instructions upon the necessity of killing and the law of self-defense."

Wharton, in the eighth edition of his Criminal Law, paragraph 486 *a*, discussing the necessity of retreat, holds retreat to be necessary upon the part of one who has been the aggressor, and, in cases of mutual personal conflict, but concludes: "Nor is retreat required from a party who at the time is standing on his rights." In the tenth edition of his work it is said (section 99): "It has also been said that a party who can fly from an aggressor is bound to fly, and cannot set up self-defense. This, as we will hereafter see, is so far true that an assailed party cannot, unless driven to the wall, take his assailant's life; but, as an elementary proposition, it is not true that if I can evade the attack by flight, then I must fly to evade the attack. If this were the law, few persons in times of trouble would remain at their posts. This, however, by confining the right of self-defense to attacks of which there could be no prior suspicion would virtually abrogate the right, for it would be to say that the right of self-defense only exists when there is nothing to defend, and besides, the fundamental principle is that right is not required to yield to wrong."

Rice on Evidence, section 360, thus sums up the principle: " A very brief examination of the American authorities makes it evident that the doctrine as to the duty of a person assailed to retreat as far as he can before he is justified in repelling force by force has been greatly modified in this country, and has with us a much narrower application than formerly. Indeed, the tendency of the American mind seems to be very strongly against the enforcement of any rule which requires a person to flee, when assailed, to avoid chastisement, or even to save human life, and that tendency is well il-

lustrated in the recent decisions of our courts bearing on the general subject of the right of self-defense."

It was in *Runyon* v. *State*, 57 Ind. 80, 26 Am. Rep. 52, where the language above quoted from Rice on Evidence was employed by the supreme court. That case is quoted with approval by the supreme court of the United States in *Beard* v. *United States*, 158 U. S. 550, and the same eminent authority likewise quotes with approval the language of the supreme court of Ohio in *Erwin* v. *State*, 29 Ohio St. 186; 23 Am. Rep. 733, where the court says: "The law, out of tenderness for human life and the frailties of human nature, will not permit the taking of it to repel a mere trespass, or even to save life where the assault is provoked; but a true man who is without fault is not obliged to fly from an assailant who, by violence or surprise, maliciously seeks to take his life, or to do him enormous bodily harm."

But, whatever diversity of opinion may be found in the books upon the general proposition of the duty of retreat, the right to stand one's ground, when assailed in one's own home or upon one's own premises, was never seriously questioned, even by the common-law writers. Thus in East's Pleas of the Crown, page 271, it is said: "A man may repel force by force in defense of his person, habitation, or property against one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as murder, rape, robbery, arson, burglary, and the like, upon either. In these cases he is not obliged to retreat, but may pursue his adversary until he has secured himself from all danger."

Likewise in Foster's Crown cases, chapter 3, page 273, it is said: "In case of justifiable self-defense the injured party may repel force with force in defense of his person, habitation, or property against one who manifestly intendeth and endeavoreth with violence or surprise to commit known felony upon either. In these cases he is not obliged to retreat, but may pursue his adversary till he findeth himself out of the danger, and, if in a con-

flict between them he happeneth to kill, such killing is justifiable."

In Wharton's American Law of Homicide (Philadelphia, 1855), at page 233, the author quotes from 1 Hale, 485: "In such a case A, whether he be a householder or a lodger, being in his own house, need not fly as far as he can, as in other cases of *se defendendo*, for he has the protection of his house to excuse him from flying, as that would be to give up the protection of his house to his adversary by his flight."

1 Russell on Crimes, chapter 3, section 2, enunciates the same rule; while Wharton (Wharton on Criminal Law, 10th ed., sec. 502) thus declares: "When a person is attacked in his own house he need retreat no further. Here he stands at bay and may turn on and kill his assailant, if this be apparently necessary to save his own life. Nor is he bound to escape from his house in order to avoid the assailant. In this sense, and in this sense alone, are we to understand the maxim that every man's house is his castle. An assailed person—so we may paraphrase the maxim—is not bound to retreat out of his house to avoid violence, even though a retreat may be safely made."

The supreme court of this state in *People* v. *Payne*, 8 Cal. 341, recognized the rule, and without further quotation from authorities it is sufficient to refer to the cases of *Beard* v. *United States, supra; State* v. *Cushing*, 14 Wash. 527; 53 Am. St. Rep. 583; *Willis* v. *State*, 43 Neb. 102; *State* v. *O'Brien*, 18 Mont. 1, where a multitude of authorities will be found collated.

It follows herefrom that the court erred in giving the instruction under consideration. That injury to the defendant resulted may not be doubted.

We do not note any other points which call for special consideration, but for the foregoing error the judgment and order are reversed and the cause remanded for a new trial.

TEMPLE, J., BEATTY, C. J., McFARLAND, J., VAN FLEET, J., and HARRISON, J., concurred.