SEAWELL, J.
 

 The defendant was duly convicted in the Superior Court of the County of Los Angeles of murder of the first degree. The information filed against him charged him with having, on or about March 17, 1937, in said county, murdered one Mrs. Olga Valle. The jury having refused to exercise its discretion in his favor, as it was empowered to do by the provisions of section 190, Penal Code, and relieve the defendant of the infliction of the extreme penalty of the law, the court in obedience to the command of the law adjudged that, as the penalty for his crime, he should suffer death, as provided by law.
 

 The appeal is presented by the public defender from the order denying defendant’s motion for a new trial, and from the judgment thus pronounced and entered against him.
 

 The crime is the outgrowth of the sordid life led by all of the parties who were in anywise linked to it. We have read the entire transcript of the testimony taken at the trial which exceeds two hundred pages of typewritten matter. The story of the homicide as related by the witnesses and corroborated by the defendant’s confession draws down the curtain on the last act of the illicit relations which had existed be
 
 *225
 
 tween- the unfortunate woman who was slain and the defendant who was urged by a jealous frenzy to take her life.
 

 On the evening of March 16, 1937, at about the hour of 6 o’clock, Mrs. Olga Valle, who was described as a woman of German origin, came to the home of Charles Green, 1529 E. 57th Street, a rendezvous where liquors were illegally dispensed. She was well known to Green, who said she had acted as his nurse during times when he was indisposed. Green was a colored man and his place seems to have been one frequented indiscriminately by men and women of his race and others. She had not been there long before a colored man named Louis Logan arrived. She and Logan soon left for a hospital where they went to call on a mutual friend who was interned at the hospital. Shortly after they had left Green's place the defendant, who is a Mexican, appeared. He inquired of Green as to the presence of Mrs. Valle and Green informed him that she and Logan had gone to the hospital and they were going from there to Chinatown to get some food and they would not return before 10 o’clock P. M. The defendant, according to his statement, had formerly sustained sexual relations with Mrs. Valle but this relationship had been interrupted for some time past.
 

 Some minutes after 10 o’clock, Mrs. Valle, Logan and another colored man named Herbert Lewis arrived at Green's place. The defendant was then in the main room awaiting the arrival of Mrs. Valle. In the meantime two other women were added to the number then in Green’s sitting or living room. Upon the arrival of Mrs. Valle in company with the two persons above named the defendant addressed her and said he wanted to talk with her. Both went into the kitchen. They talked some few minutes but their conversation was inaudible to the persons occupying the sitting room. As they returned to the sitting room the defendant said: “Olga, you don’t love me no more.” She replied: “I don't love you no more, I am through.” The defendant then said: “You can't quit me. I love you. I will kill you—I will kill myself. ’ ’ They were both standing glaring at each other. The brother of the deceased who incidentally was a new arrival, said to the defendant: “Frank, let my sister alone, don’t bother her.” The defendant said: “All right, Jack.” They then stepped out onto the front porch ^and engaged in friendly conversation. As they returned Mrs. Valle had left
 
 *226
 
 the house through a back door. Defendant asked Green where Mrs. Valle had gone and when told that he did not know he insisted that he did know and demanded that he bring her in. The defendant began looking for her and while he was outside she returned to the room. The defendant also returned within a few minutes. The couple again went to the kitchen for further conversation at defendant’s request. Their voices could be heard but the only words distinctly heard by the persons in the sitting room were spoken by Mrs. Valle, to the effect, “Frank, I don’t know nothing about it. I haven’t got it.” No one knew the significance of those words. Both came out and sat in the room. The defendant appeared to be in a sullen mood. They were talking in a quarrelsome manner until about 1:30 A. M. He again said he would kill her and kill himself. Finally, Mrs. Valle, who appeared to fear him, slipped out of the room into Green’s bedroom and locked the door. Jim Turner, an Indian, had also arrived at the place and was in the room during a good part of the evening. Mrs. Valle called from the room and asked if Jim Turner would drive her home. On being assured that he would she returned to the sitting room and as she and Turner went down the steps she called to Herbert Lewis to come with them as she was afraid to go home. Lewis complied with the request and Mrs. Valle left in Turner’s car accompanied by- Turner and Lewis. The defendant left the premises some ten minutes later and was not seen until immediately before the commission of the crime, some hours thereafter. Green said that defendant appeared to be in a morose mood and said very little, if anything, to those present except Mrs. Valle. When he departed for the evening he said to Green that he would see him again.
 

 Lewis, Turner and Mrs. Valle drove to her home and found that she had lost or misplaced the key to her house and they then went back to Green’s place in quest of the key but found it closed. Returning from Logan’s house where they had gone in search of the key, to Mrs. Valle’s home, they stopped and bought some food. Upon arriving at Mrs. Valle’s home, No. 5737 South Durate Street, they found the door locked. They forced the lock and entered. This was at about 2 o’clock A. M., March 17th. Turner remained about ten minutes, leaving Lewis and Mrs. Valle at the house. Lewis testified that he was frying eggs for Mrs. Valle in
 
 *227
 
 the preparation of a sandwich he was making for her. She was in the bedroom in her night robe lying on the bed. He said that while he was in her room near the foot of her bed he heard the back door crash and in came the defendant with a large dagger in his hand and he made a desperate lunge at him. Lewis by timely bodily maneuvers succeeded in avoiding defendant’s knife thrusts and was closely pursued by defendant as he made a hasty retreat down the front steps. As he paused in the yard for a moment he heard four screams coming from Mrs. Valle’s bedroom. The first and second were very loud; the third not so loud and the fourth was very feeble. The defendant then left the house by the rear door and in leaving the premises he passed near the badly frightened Lewis. Neither spoke a word. After a few minutes Lewis entered the house and discovered the body of the deceased in a corner of the room partially under the bed. The floor and walls were bespattered with blood and he thought she was dead at the time he entered. He notified the sheriff’s office and the officers arrived within a short time thereafter.
 

 Manuel Bodriguez lived with his family in a house which was but fifteen or twenty feet from the house occupied by Mrs. Valle. He was awakened at about 3:30 on the morning of March 17th by the screams of a woman. The screams were several seconds apart, and emanated from Mrs. Valle’s room. The first was very loud; the second not quite so loud; the third much weaker and the fourth was quite faint. As he opened his bedroom window he heard a door slam, and saw the defendant leaving the premises. The defendant ran into an obstruction and changed his course. In strong language he commanded him to stop. The defendant momentarily halted and raised his face toward Bodriguez's window. Ho muttered some expletive, “Oh my," or “I," bent over and ran from the premises and was afterwards apprehended and lodged for a time in the Santa Ana county jail.
 

 The report of the autopsy physician made on the body of the deceased was admitted in evidence on the stipulation of the attorney for the defense. The report stated that twenty wounds were visible on the chest and left arm and forearm of the deceased. Two penetrated the right lung. Two penetrated the right ventricle of the heart. Some of the other wounds were deep and others were superficial. There existed
 
 *228
 
 no question as to the cause of death. The defendant did not take the witness chair in his defense but he made a statement or confession as to the commission of the crime which in all material respects agrees with the testimony adduced at the trial. Evidently he had gone to the home of the deceased and awaited her expected arrival with Lewis. From without he had observed his action in relation to Mrs. Valle. He said he broke through the door when he saw Lewis preparing to go to bed with Mrs. Valle. His statement in this respect under the circumstances of the situation is very persuasive. He attributed his act to jealousy. He gave his age as forty-nine years. He also said that his blood was impure. There was no evidence as to mental irresponsibility and he said that he had drunk four or five glasses of beer during the evening but that he was sober. While it is true that the abandonment of all sense of moral duty on the part of the unfortunate woman was exhibited in a shocking degree, the law will not justify or excuse the putting to death of such person unless in so doing it is necessary for the protection of the life or limb of the one who kills. No legal reason whatever is offered in extenuation of the crime admittedly committed by the accused. The defendant admitted that he had threatened to kill her on other occasions. He claimed that she had tricked him in some unexplained manner. Premeditation and deliberation extending over a period of four or five hours clearly appear. The knife which defendant used was described by him as “one of those long handled knives with a long blade”. He said the blade was more than four inches in length. He did not claim that the woman made any attempt to strike him and the inference, from his statement as to the merciless assault, is that she fell to the floor wounded very early after he reentered her bedroom.
 

 Appellant in his brief frankly concedes the proposition that no question is presented as to the guilt of the defendant, and that the sole question presented is as to whether the jury was adequately instructed as to the degrees of murder, particularly as to murder of the second degree and also as to the discretion reposed in the jury to relieve the defendant of the extreme penalty prescribed by the statute.
 

 Appellant, in his brief, takes the position, as stated by him, that the question is “not whether the evidence in the case will sustain a verdict of guilty but whether a
 
 *229
 
 different verdict than the one the jury rendered would have been returned if no errors had been committed”. No errors are claimed as to the admission or rejection of evidence, but the sole claim of error is placed upon the rejection of certain instructions offered by defendant as to the law of murder of the second degree and the inadequacy of the instructions which were given by the court as to the elements which must necessarily appear to constitute murder of the first degree. As to the latter degree, it is also contended that the jury was not as fully instructed in the exercise of its discretion as is usual in cases involving the death penalty.
 

 Most, if not all of the instructions, offered by defendant were refused. He complains that certain instructions given by the court were sketchy and inadequate. As to the subjects above noted he cites and quotes from
 
 People
 
 v.
 
 Cook,
 
 148 Cal. 334-347 [83 Pac. 43], wherein this court reversed the judgment for the reason that a proffered instruction requested by the defendant was refused. It is there said, former Chief Justice Beatty, writing the opinion: ‘‘The court, however, refused the instruction and its refusal is justified on the ground that another instruction framed on the same point was given. It is true that the instruction given stated the law correctly; but it was brief, general, and colorless in comparison with the instruction asked, and had the effect of minimizing the importance of a consideration which could not have been stated with too much emphasis. The instruction as asked, should have been given.”
 

 The court in the instant case gave to the jury the definition of murder as set forth in section 187, Penal Code; also the definition of malice and the degrees of murder, as defined in sections 188 and 189, respectively of said code. Section 189 does not specifically describe murder of the second degree. After describing murder of the first degree it closes the subject with the clause, ‘‘and all other kinds of murder are of the second degree ’ ’. The court gave an instruction which did somewhat amplify the concluding clause of section 189, Penal Code. In distinguishing the two degrees it instructed the jury that to constitute murder of the first degree the ‘‘unlawful killing must be accompanied with a deliberate and clear intent to take life in order to constitute murder of the first degree. The intent to kill must be the result of deliberate premeditation. It must be formed upon a pre
 
 *230
 
 existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation.” Again the jury was told that if the circumstances show an abandoned heart it is murder of the second degree, unless the evidence proved the existence in the mind of the slayer of the specific intent to take life. While several instructions offered by the defendant and refused by the court were more elaborate, and perhaps would have given the jury a clearer understanding of the law as to murder of the second degree than the abstract definitions given by the court, we cannot say that they fail to meet the requirements of the law. Appellant also complains of the court’s refusal to give approved instructions founded on basic principles of criminal law and the substitution of others which were weakened by phraseology, by modification or eliminations, while the prosecution’s instructions were couched in strong and virile language. As a ground of complaint he cites the instruction as to the discretion which the law reposes in the jury to relieve the accused of the extreme penalty of the law. We agree that it would be more satisfactory in death penalty eases if the court would instruct the jurors that if they entertain a reasonable doubt as to which one of two or more punishments should be imposed, it is their duty to impose the lesser. This rule should prevail in every case where the punishment is divided into degrees and the jury is given discretion as to the punishment. We feel, however, that the jury was fully informed as to its discretion by the last instruction given in the case, as follows: “. . . It is entirely for the jury to determine which of the two penalties is to be inflicted in ease of murder in the first degree, the death penalty or confinement in the state prison for life. If the jury should fix the penalty at confinement in the state prison for life, you will so indicate in your verdict. If, however, you fix the penalty at death, you will say nothing on this subject in your verdict, nor will you specify the death penalty in your verdict. In the exercise of your discretion as to which judgment shall be inflicted you are entirely free to act according to your judgment.” The foregoing language clearly informed the jury that it had the discretion of relieving the defendant of the death penalty.
 

 There was no semblance of manslaughter in the ease and the defendant was not legally entitled to an instruction
 
 *231
 
 as to manslaughter unless such an instruction was rendered material by the instruction given by the court as to the shifting of the burden of proof (see. 1105, Pen. Code), wherein it is provided that the homicide being proved and the proof offered on the part of the prosecution to establish the homicide tended to show that the crime committed amounted to manslaughter or that the defendant was justifiable or excusable. The proof incontrovertibly showed the crime to be one of murder of the first degree.
 

 We state here, and we do not mean to confine our observations solely to the instant ease, that there seems to be an expanding tendency, on the part of trial courts particularly in aggravated cases of homicide, to curtail and limit the instructions by qualification and selection of phraseology, which have to do with the cardinal principles of criminal law to such an extent as to give basis of complaints which are too frequently presented to our appellate courts for review. Any attempt to improve on the pronouncements of the law of homicide which are the product of our most profound minds in the study of criminology and its relation to sociology is attended with dangers of overstepping the age-old axioms which have long stood as the measure by which human responsibility has been appraised.
 

 We have, in our reports, a long approved thesis on the law of homicide in the case of
 
 People
 
 v.
 
 Iams,
 
 57 Cal. 115. In that case the definition of murder in its different degrees is set forth in logical sequence and gives to the jury a complete understanding of the subject of homicide and the definition of reasonable doubt which has been carried into section 1096, Penal Code. We do not mean to say that in exceptional cases there may not be need for the court to meet a new or extraordinary situation by special instructions, but we do say that the cardinal rules there set forth as to the law of homicide furnish a safe and complete guide as to the subjects of which they treat. This court, in affirming the judgment in the lams case, in commenting on the instructions felt that it was “obliged to say, in justice to the learned judge who presided at the trial, that the charge to the jury is a very clear and able statement of the law of homicide”.
 

 Returning to the instant case, it may be said in consideration of the evidence and the statement made by the defendant, a plea of guilty would not have given additional strength
 
 *232
 
 to the conclusive character of the case made against him as to first degree murder. In justice to his defense it may be added that he did say in his statement that the relations which he witnessed as about to be entered into between his former amour and Lewis so stirred him with a feeling of outrage and indignation that he completely lost control of himself and he was thereby impelled by force of such mental perturbation to commit the acts which resulted in immediate death.
 

 We must assume that the jury considered this feature of the case in determining whether the acts were the result of a sudden heat of passion and the motivating cause was sufficient to cause a reasonable person to act as he acted, and it determined, under all the circumstances of the case, that there did not appear sufficient reason to relieve the defendant of the extreme penalty of the law or to reduce the crime to second degree murder.
 

 We find nothing in the record that would justify this court in interfering with the judgment.
 

 The order and judgment are accordingly affirmed.
 

 Curtis, J., Waste,.C. J., and Shenk, J., concurred.
 

 Edmonds, J., concurred in the judgment.