[Crim. No. 1297. In Bank.—May 18, 1906.]

## THE PEOPLE, Respondent, v. RICHARD B. MAUGHS, Appellant.

CRIMINAL LAW—MURDER—SELF-DEFENSE—RIGHT TO STAND GROUND—ERRONEOUS INSTRUCTION—CONFUSION OF JURY.—Where the testimony of a defendant charged with murder showed a clear case of self-defense against an attack upon him by deceased with a knife with threat to cut his throat, defendant was entitled to correct instructions as to his right to stand his ground against such an attack; and it was reversible error to instruct the jury that "before a person can be justified in killing a human being on the ground of self-defense, he must, when attacked, employ all reasonable means within his power consistent with safety to avoid the danger and avert the necessity for the killing." The fact that the jury were elsewhere correctly instructed on the subject does not answer the objection, as the result served but to confuse the jury, and to render it impossible to determine whether they followed the law as corectly or as incorrectly given.

ID.—MISLEADING INSTRUCTIONS—PURSUIT TO KILL—COMBAT—RETREAT —ABSENCE OF PERTINENT EVIDENCE.—Where there was no evidence of any pursuit by the defendant to kill the deceased, or of any struggle or combat in which either party sought to retreat, it was misleading to give abstractly correct instructions relating to those subjects.

ID.—PRESUMPTION OF INNOCENCE—IMPROPER INSTRUCTION.—An instruction to the jury on the subject of the presumption of the innocence of the defendant, which is open to the construction that if the jury were disposed to presume the defendant innocent they could do so, and if they were not they need not, is improper.

ID.—ERRONEOUS INSTRUCTION AS TO CREDIBILITY OF DEFENDANT.—It was reversible error to instruct the jury that ''where the defendant offers himself as a witness in determining his credibility, it is proper to take into consideration the consequences, inducements, and temptations which would ordinarily influence a person in his situation.'' Such instruction is prejudicial to the rights secured to the defendant by the constitution and laws.

ID.—MURDER IN FIRST DEGREE—INSTRUCTION NOT PROPERLY QUALIFIED. —An instruction that ''it is only necessary that the act of killing be preceded by a concurrence of the will, deliberation and premeditation on the part of the slayer, and if such is the case the killing is murder in the first degree,'' is erroneous in not being qualified by stating that the act of killing must be ''*the result of*'' such concurrence as well as preceded by it.

ID.—DEFINITION OF MURDER IN SECOND DEGREE AND MANSLAUGHTER— LANGUAGE OF CODE.—Instructions defining murder in the second degree and manslaughter ought strictly to follow the language of the Penal Code defining them.

ID.—READING OF INFORMATION TO THE JURY.—It was not error for the court to read the information to the jury in the opening of its instructions.

ID.—MODEL OF PORCH—EVIDENCE.—It was not prejudicial error for the court to permit a model of the porch where the deceased was standing when shot by the defendant to be erected in the courtroom, and to be introduced in evidence.

ID.—ERRONEOUS EVIDENCE OF WOOD CUT.—It was error to admit as an exhibit a wood-cut taken from a photograph of the porch, with a man lying in the assumed position in which the body of the deceased was found, which was not a photograph of the deceased or of one who saw the dead man on the porch.

ID.—ERRONEOUS SEPARATION OF JURY.—It was error prejudicial to the defendant for the court to permit certain members of the jury to go to their homes after the jury had been impanelled and sworn and placed in the charge of the sheriff, who had been sworn to take charge of them under section 1121 of the Penal Code, and who retained the custody of the remainder of the jurors.

ID.—STATUTORY ADMONITION TO BE SHOWN BY RECORD.—That the stat-
utory admonition was given to the jury upon its recesses and
adjournments should be shown by the record upon appeal.

APPEAL from a judgment of the Superior Court of Merced
County and from an order denying a new trial. E. N. Rector,
Judge.

The facts are stated in the opinion of the court.

J. W. Knox, and B. F. Fowler, for Appellant.

U. S. Webb, Attorney-General, for Respondent.

HENSHAW, J.—Defendant, charged with the murder of
one Charles Zander, was found guilty and the death penalty
imposed. He appeals from the judgment and from the order
denying his motion for a new trial.

Zander and B. E. Cole were working a ranch in partnership.
Defendant, a man between fifty-five and sixty years of age,
was in their employ as a "handy man," to cook, take care
of the chickens, mend fences, and do other "odd jobs." The
two partners, upon the morning of the homicide, had ridden
out from the ranch to look after and repair the fences, leaving
defendant alone at the ranch-house. At about eleven o'clock
in the morning Cole returned, and with him came one Edward
Gallagher, a wood-chopper. Cole had come back for a hammer
and some staples with which to repair a broken fence, and
went away immediately, leaving Gallagher with the defendant.
Cole joined Zander, and while the two were repairing a piece
of broken fence, Leo Green, a neighbor, rode up and said that
he had told Maughs about that break in the fence two or three
days before, and Zander replied, "The lazy, damn son of a
bitch, why did n't he fix it up?" About noon Zander and Cole
returned to the house. They put their horses in the stable,
and Zander then walked rapidly up to the house and entered
it, while Cole remained in the vacant lot near the barn.
Zander was flushed and irritated. He asked the defendant
why he had not fixed the fence that Leo Green had told him
about days before, and defendant replied that he had fixed
it. He asked him why in the devil he did not get those cattle
out of the horse pasture, and, at the end of defendant's ex-

planations and denials, said: "You ain't doing a damn thing around here; you ain't doing any work at all like you ought to; the best thing I can do with you is to break your damn neck." He turned away down the walk which led to the gate and went halfway there and turned and said, "Maughs, the best thing you can do, is to roll your blankets and get off this ranch," to which the defendant replied, "All right, I can do that."

Defendant then (according to his own account), worrying over the excited and angry tone and manner of the deceased, and fearful of bodily harm at his hands (for the deceased was a very strong, vigorous young man weighing about one hundred and sixty-five pounds, while the defendant was a much older man and partially crippled), went into the room where were many rifles and other weapons and put his own pistol in his pocket. Deceased, who had gone over to the smokehouse a short distance away, soon returned to the house and renewed his altercation with defendant (this is still the defendant's account), abusing him, charging him with remissness in his work, and with general worthlessness, ending up by saying: "You are a damn Missouri lying son of a bitch," to which defendant replied, "Now cut that part out, that 'lying son of a bitch' part. Just cut that part out, for it is a damn lie. You can accuse me of being trifling, but I am not a son of a bitch." The deceased then walked out of the sitting-room into the kitchen near where the defendant was at work getting dinner, with a knife in his hand, and said to defendant: "I ought to cut your God damn throat." Defendant made no reply to this, and deceased, continuing his abuse, walked out upon the rear porch. The defendant not hearing him, supposed that he had gone to the smokehouse again. Picking up some potato peelings, he started to the door to throw them into the slop-bucket. Reaching the door, he took one step down onto the porch, which was about six inches lower than the kitchen floor, and then saw the deceased at the sink, which was on the porch, about five feet from the doorway. As defendant took this step to the porch, deceased turned toward him with his knife in his hand, gritted his teeth, and said to defendant: "You damn son of a bitch," to which defendant answered, "I told you a while ago that was a lie." Deceased replied, "I will cut your damn throat," and with that rushed at the

defendant with the knife in his left hand and his right hand raised. Defendant tried to get back, but stumbled, and as the deceased was upon him, drew his pistol and fired without taking aim. The shot struck the deceased under the right eye, going through the jawbone upward to the back part of the head. He fell back on the porch, and death was instantaneous.

Such is defendant's account of the fatal affray. At the time of the shooting, and at the time the deceased returned to the house for the last time, Cole and Gallagher were sitting in the outer lot on a wagon tongue, about one hundred and ten feet distant. Between them and the back porch where the shooting occurred were two chicken fences. Part of the side of the porch intervening between where Cole and Gallagher were sitting and the place of the shooting was covered with trellis work and a thick vine extended from the floor to the top of the porch. Cole and Gallagher were sitting about forty feet to the right of the porch and upon an incline which was some three or four feet lower than the ground at the house. The fences were six feet high and the pickets were close together. Cole was sitting upon the wagon-tongue about three feet from where Gallagher was sitting, and more directly facing the house. Gallagher says that he was paying no particular attention and could not see nor hear what was going on at the house, and that his attention was first drawn to the house by the pistol-shot. Cole says that he was interested in what was going on at the house and could see and hear from where he sat. Cole's account is that there was a pump on the porch by the sink, that Zander had gone onto the porch, went to the pump, and took hold of the handle of it and worked it up and down; that there is no doubt but that the two men were angry, and from the tone of Zander's voice he was very much irritated; that he heard Maughs go into the kitchen from the sitting-room, and before he got to the door he said he was getting damn tired of this noise, he had heard enough of it, "and he says, 'Let this be your last word,' and shot." Zander was then telling him that he didn't see why he couldn't find a hole in the fence that had taken him but two minutes to find after he had got there, but he didn't quite finish that sentence until he was killed. "I could see Zander standing on the porch. I could not see his legs, but saw him

CXLIX Cal.—17

from the waist up. I noticed the position of his hands while
he was there at the pump. I saw him put the cup to his
mouth with his right hand, and had the pump-handle in his
left. Zander's position when he was shot was he turned
around facing, or not exactly facing Maughs, but he was look-
ing in the door. His body was not quite turned square with
the door. I should judge he was about three and a half
or four feet from the door, something like that. I did not
see him make any move to the door or raise either hand, and
I suppose I would have seen him if he had done so. After
the first shot was fired I heard Zander hit the door. I did
not see him fall, as I had just dropped my eyes off of him,
but as soon as the shot was fired I raised my eyes and he was
not there, and in the interim though I heard him fall.'' After
hearing this shot Cole promptly went to the barn, mounted
his horse and rode off. The testimony of Gallagher serves in
some respect to discredit that of Cole. Cole says that he was
an actual eye-witness, saw the defendant murder Zander, saw
the shot fired, and heard Zander's body fall. Gallagher, who
was also an employee on the ranch, says that, sitting upon
the wagon-tongue, he was talking to Cole; that he heard the
men talking at the house, but did not understand or try to
understand what was going on. Pretty soon he heard a pistol
shot, ''and Cole jumped off the tongue and told me to run
to the house and see if he shot him, and he would go to
French's.'' It is a little surprising if Cole had actually seen
what he testifies to, that he should have sent Gallagher to
the house to see what occurred. Cole admits to disagreements
with, and a prejudice against, the defendant antedating the
shooting. There had, however, been no difficulty between the
defendant and Zander prior to the day of the homicide. Cole
hastily mounted his horse and left the ranch, in manifest fear
of the defendant, and it is in evidence that he said he had
told Zander that neither of them ''had better bother or crowd
Maughs too much or egg him on; that he might shoot.'' As
Cole turned to go to the barn, Gallagher walked toward the
house and stopped and stood when within eighty feet of it.
He could hear nothing. He then turned back to the wagon
and stood there a little while, when he heard two shots in
quick succession, and, looking up, saw Maughs standing on
the step of the porch. Maughs spoke to Gallagher, asking

him if he had seen a hawk; that one had flown that way.
Gallagher replied, "No," and walked away from the house
up on a neighboring hillside. He remained there about ten
minutes, when he saw Maughs leaving the house. Maughs
went to the barn and took a horse, rode off, and surrendered
himself to a peace officer. Gallagher then returned to the
house and found the dead body of Zander lying on the porch,
with its head against the wall under the sink, and an open
pocket-knife with a large blade about four inches from his
left hand. On the ground, about two feet from the edge of
the porch, was lying a drinking-cup. This drinking-cup,
however, Gallagher had not noticed until after several other
witnesses had arrived and one of them had pointed it out.
The two shots, which both Gallagher and Cole heard fired in
quick succession, were explained by the defendant. He says
that after having shot Zander he feared an attack from Cole,
went into the gun-room, took down a repeating rifle with
which to defend himself, and in the haste and excitement of
loading it was twice accidentally discharged, the shots piercing
the ceiling of the room. Such was undoubtedly the truth,
as the two new bullet-holes were there discovered.

It has been necessary thus to set forth at length the con-
flicting stories of the defendant and of the prosecution's
chief witness for the proper understanding of the rulings of
the court, and also as showing the importance to the defendant
of correct instructions upon the law of self-defense, and his
right to have the jury properly charged thereon. By the
testimony of Cole, the defendant shot down Zander under
no more provocation than that excited by a verbal wrangle
and words of personal abuse. By the testimony of the
defendant he shot, in self-defense, a young and vigorous
man, his physical superior, who was making a deadly assault
upon him with a lethal weapon. The court instructed the
jury as follows: "No man has a right to kill another in
self-defense unless such killing is really or apparently neces-
sary for such defense. Before a person can justify taking
the life of a human being on the ground of self-defense he
must, when attacked, employ all reasonable means within his
power, consistent with his safety, to avoid the danger and
avert the necessity for the killing." This instruction is taken
from Sackett's Instructions to Juries (2d ed., p. 707). In

support of it is cited *Judge* v. *State,* 58 Ala. 406, 413, [29 Am. Rep. 757]. There the supreme court of Alabama says: "We are pleased to observe that in this case the old, sound, and much disregarded doctrine, that no man stands excused for the taking of human life, if with safety to his own person he could have avoided or retired from the combat, has been given in the charge and must have been acted upon by the jury." In *People* v. *Hecker,* 109 Cal. 467, [42 Pac. 307], this court had occasion to consider the right of a defendant to stand his ground, as against his duty to retreat, and it was there said that there was a contrariety of opinion upon the part of writers of common law upon this subject, and that this difference had found its way into the decisions of our states; that some, as Alabama, hold to the rule of retreat, and others, including our own state, declare strongly for the opposite doctrine. It was also said that it was not stating it too strongly to say that the trend of the later judicial decisions was in favor of the rule as laid down in this state, and it was further added that the right to stand one's ground should form an element of the instructions upon the necessity of killing and the law of self-defense. This was no new declaration upon the part of this court; the same principle had been enunciated in *People* v. *Ye Park,* 62 Cal. 208, and has since been consistently followed in *People* v. *Lewis,* 117 Cal. 186, [49 Am. St. Rep. 167, 48 Pac. 1088], and *People* v. *Newcomer,* 118 Cal. 263, [50 Pac. 405]. No exposition is necessary to show that the giving of this instruction, which imposed upon the defendant the duty of flight, and forbade him the right to stand his ground, was error of such gravity as to demand a reversal of the case. But in exposition of the fact, as stated in *People* v. *Hecker,* 109 Cal. 467, [42 Pac. 307], that the trend of modern decision is in favor of the rule as laid down in this state, the following quotation from the supreme court of Missouri in *State* v. *Bartlett,* 170 Mo. 658, [71 S. W. 148], is apposite. The supreme court of Missouri, in receding from the earlier rule which demanded retreat (*People* v. *Partlow,* 90 Mo. 608, [59 Am. Rep. 31, 4 S. W. 14]), declares: "It is true, human life is sacred, but so is human liberty; one is as dear in the eyes of the law as the other and neither is to give way and surrender its legal *status* in order that the other may exclusively exist, supposing for

a moment such an anomaly to be possible. In other words, the wrongful and violent acts of one man shall not abolish or even temporarily suspend the legal and constitutional rights of his neighbor. And this idea of the non-necessity of retreating from any locality where one has a right to be, is growing in favor, as all doctrines based upon sound reason inevitably will.''

Nor is it any answer to this objection that the court elsewhere gave a correct instruction upon the subject. The result served but to confuse the jury and to render it impossible to determine whether in their deliberations they followed the law as correctly or as incorrectly set before them. (*People* v. *Campbell*, 30 Cal. 312; *People* v. *Anderson*, 44 Cal. 65; *People* v. *Wong Ah Ngow*, 54 Cal. 151, [35 Am. Rep. 69]; *People* v. *Messersmith*, 57 Cal. 575; *People* v. *Thompson*, 92 Cal. 506, [28 Pac. 589]; *People* v. *Pearne*, 118 Cal. 154, [50 Pac. 376].)

The court in giving instructions upon the law of self-defense, charged the jury as follows: ''So, too, under such circumstances, he may pursue and slay his adversary, but the pursuit must not be in revenge, nor after the necessity for the defense has ceased, but must be prosecuted in good faith to the end of winning his safety and securing his life.'' And again it charged the jury: ''It must appear that the defendant, if he were the aggressor, not only really and in good faith endeavored to decline any further struggle, and to escape from his assailant before the fatal blow was given,'' etc. In point of law these instructions are unimpeachable, but they are wholly without the evidence in the case and impertinent to any theory based upon that evidence. There is no word of testimony, either by the prosecution or the defense, touching pursuit, nor touching any struggle or combat from which either party sought to retreat. These instructions, too, could only have served to mislead the jury into the belief that the court in some manner found evidence of pursuit, or of a declination to engage in further combat, which prompted the giving of these instructions. (*People* v. *Sanchez*, 24 Cal. 28; *People* v. *Devine*, 95 Cal. 227, [30 Pac. 378]; *People* v. *Bird*, 60 Cal. 7; *People* v. *Smith*, 105 Cal. 676, [39 Pac. 38].)

The court instructed the jury as follows: ''For the purpose

of this trial and before you had heard any evidence a presumption of the innocence of the accused arose. Independent of evidence he was presumed by you to be innocent. This presumption of innocence arising at the outset, attends him throughout the trial and until you have finally determined upon your verdict. You are not to forget it in weighing the testimony." The language of the Penal Code (sec. 1096) is brief and clear. "A defendant in a criminal action is presumed to be innocent until the contrary is proved." This, as over and over declared, means that a defendant has the unquestioned right to have the jury which is trying him for crime instructed that they must presume him to be innocent until his guilt is shown beyond a reasonable doubt. The instruction given by the court by no means fills the measure of the defendant's right in this regard. "Independent of evidence," says the court, "he was presumed by you to be innocent." What the jurors may have understood by this language we cannot say; but it is certainly open to the construction that if they were disposed to presume him innocent they could do so, and if they were not they need not. Nothing can be gained and much may be sacrificed by such uncalled for departures from the plain letter of the statute, and from the oft-repeated and oft-approved language in construing it. It is not the same thing to say to a jury, "This defendant was presumed by you to be innocent," as it is to say, "The law clothes the defendant with the presumption of innocence, and, therefore, you must presume him to be innocent until the contrary is shown."

People's instruction No. 27 contained a most faulty definition of murder in the second degree. It should not have been given. Section 189 Penal Code is sufficiently explicit on the subject.

The court gave an instruction, as to the inadvisability of giving which trial courts have been repeatedly cautioned. The instruction is the one copied from *People* v. *Cronin,* 34 Cal. 195, which declares: "Where the defendant offers himself as a witness, in determining his credibility, it is proper to take into consideration the consequences, inducements, and temptations which would ordinarily influence a person in his situation." The giving of this instruction has always been discountenanced by this court. It has been said that

justice would be more surely accomplished if no such instruction were given. It has been said that it is difficult, logically, to attribute the giving of such an instruction to anything other than a purpose to expressly disparage the defendant, "the very thing that a court has no authority to do, in view of our constitutional provision." Trial courts have been commended by this court when they have refused to give this instruction. (*People* v. *Van Ewan,* 111 Cal. 144, [43 Pac. 520]; *People* v. *Winters,* 125 Cal. 329, [57 Pac. 1067]; *People* v. *Boren,* 139 Cal. 215.) And after all this admonition, after all these cautions, the conclusion is forced upon us that when a trial judge does give this instruction to a jury, it can be with no other purpose than to throw his judicial weight into the scales against the defendant on trial before his court. For this reason, therefore, we think the time has come to say that in all future cases which shall arise, and where, after this warning, this instruction shall be given, this court will hold the giving of it to be so prejudicial to the rights of a defendant, secured to him by our constitution and laws, as to call for the reversal of any judgment which may be rendered against him.

The court in instructing the jury that there need be no appreciable space of time between the formation of the intent to kill and the act of killing, said: "It is only necessary that the act of killing be preceded by a concurrence of the will, deliberation, and premeditation on the part of the slayer, and if such is the case the killing is murder in the first degree," etc. This instruction is drafted upon the instruction approved in *People* v. *Morine,* 61 Cal. 369, but omits the necessary qualifying words given in that instruction which there reads, and should read, as follows: "It is only necessary that the act of killing be preceded by and *the result of* a concurrence of will," etc. The omission of these words would make a killing which was not the result of deliberation and premeditation, but which had at any time been preceded by it, murder in the first degree. Such, of course, is not the law. The killing itself must be the result of the concurrence of will, deliberation, and premeditation.

The court, in attempting to define manslaughter in the language of the code, declared that it was: "First, voluntary upon a sudden quarrel and heat of passion." It cannot be

perceived how the defendant was injured by the court calling
for the concurrence of two conditions, when the law requires
but one, but lest, by our silence, it may be assumed that
the court has approved this instruction, it should be said that
the language of the code should be strictly followed.   (Pen.
Code, sec. 192.)

We perceive no force in appellant's objection that the court
was not warranted in reading the information to the jury,
as it did, in the opening of its instructions.   The regular
procedure in the trial of a criminal case calls for the reading
of the indictment or the information after the impanelment
of the jury, and that the court should repeat its contents, to
point the instructions of law which it was about to give, is
in no sense error.

There was erected in the courtroom, visible to the jury
during its impanelment, and afterward admitted in evidence,
a structure built as nearly as might be in duplicate of the
porch upon which Zander was standing when shot.   In this
we perceive nothing prejudicial to the rights of defendant.
The rules of evidence in civil actions are applicable to criminal
actions   (Pen. Code, sec. 1102), and, under proper restrictions
of proof, models, facsimiles, and photographs are admissible
in criminal as well as in civil cases.

After the jury had been impaneled and sworn and had
been placed in charge of the sheriff, and the sheriff had
been sworn to take charge of the jury, under section 1121
of the Penal Code, the court allowed eight of the jurors to
separate and go to their homes, while the remaining four
were retained in the sheriff's custody.   While the commission
of the jury to the custody of the sheriff during the trial
of a criminal case is discretionary with the court, when the
court has once exercised that discretion, the law contemplates
that it is exercised quite as much for the rights of the
defendant as for the rights of the people.   If the jury is
liable to be subject to improper influences,—if there is danger
of this, which is the ground calling for the exercise of this
judicial discretion, in the purview of the law those influences
may as likely be exercised against the defendant as in his
favor.   There is absolutely no warrant in the law for the
course the court adopted, and the order permitting the jury
to separate was error,—indeed, error of such nature that

the brief of the state offers no word in extenuation or justification of it.

It was error for the court to have admitted people's exhibit 12 over defendant's objection. This exhibit was a woodcut taken from a photograph by a newspaper man at Los Banos and published in his newspaper. It was a picture of the porch with a man lying in the assumed position in which Zander's body was found. It was not a photograph of Zander's body when found. Neither the man who took the photograph nor the man who represented the dead body ever saw the body of the dead man on the porch.

The record fails to show that the court gave the statutory admonition to the jury upon many of its recesses and adjournments as required by section 1122 of the Penal Code. This admonition should, of course, be given, and the record of the case should disclose the fact of its having been given. (*People* v. *Thompson*, 84 Cal. 589, [24 Pac. 384].)

Other alleged errors touching the misconduct of the jury do not call for particular attention, as it is improbable that there will be a repetition of them upon a second trial.

For the reasons above given, the judgment and order appealed from are reversed, and the cause remanded for a new trial.

Beatty, C. J., Lorigan, J., and McFarland, J., concurred.

ANGELLOTTI, J., concurring.—I concur in the judgment of reversal upon the ground that there was prejudicial error in the giving of the following instruction:—

"27. 'Heat of passion' as used in these instructions, means a condition of quick anger or sudden injury, engendered by real or supposed grievance suffered at the time. And in order to reduce a crime of murder in the first degree to murder in the second degree, the killing must be done upon the instant provocation is given, or so soon thereafter that the blood has not had time to cool and reason resume its sway before the mind has had time to consider the character and gravity of the act about to be done, and not from hatred or pre-existing revenge."

The evidence in the case, as shown by the majority opinion, was such as to make it exceedingly important to the defendant that the distinction between murder in the first degree and

murder in the second degree should be clearly and precisely made known to the jury. The homicide was apparently the result of a quarrel commenced on that very day, the evidence indicating that the relations between the parties had been very friendly up to that time.

The instruction set forth above is not a correct statement of the law in this regard. To reduce a crime from murder in the first degree to murder in the second degree, it is not essential that the killing should be done upon the instant that provocation is given, or so soon thereafter that the blood has not had time to cool. If, as a matter of fact, a killing is done without deliberation, and premeditation, except in special cases mentioned in the code, of which this is not one, it is only murder in the second degree. The statements contained in this instruction would have been material in determining as between murder and manslaughter, but as between the two degrees of murder they had no place, and we are unable to say that they did not mislead the jury to the prejudice of defendant.

Under the circumstances of this case, as shown by the record, I find no other prejudicial error.

Shaw, J., and Sloss, J., concurred.