[Crim. No. 1032. Third Appellate District.—July 10, 1928.]

THE PEOPLE, Respondent, v. CASSIE TURNER, Appellant.

C. S. Baldwin and J. T. Sharp for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

PLUMMER, J.—The defendant was convicted upon an information charging her with the offense of manslaughter, and appeals from the order denying a motion for a new trial and from the judgment of conviction.

Upon this appeal the principal grounds urged for a reversal are that the verdict is not sustained by the evidence; that the court erred in its instructions to the jury; and that prejudicial error was committed in calling in a person, who was not a judge of any superior court of the state of California, to pass upon the defendant's motion for a new trial. Several minor points are also set forth as reasons why the judgment herein should be reversed. By rea-

son of the conclusion at which we have arrived, it is not necessary for us to discuss more than one of the principal reasons urged for reversal, to wit: Alleged errors in instructions given by the trial court to the jury. Whether the evidence is or is not sufficient to sustain the verdict, or whether error was committed in calling in someone, not a judge of the superior court, to pass upon the defendant's motion for a new trial, will be shown to be immaterial when we have stated our conclusions as to the merits of this case. The minor errors alleged are such as may not occur again, and, therefore, need not be set forth at length herein.

The record shows that on and for a short period prior to the sixteenth of February, 1928, the defendant (an Indian girl), and the deceased, Robert DeClute, had been occupying a railroad car, used as a residence. On the evening of the sixteenth of February, 1928, the defendant and another Indian girl named Dressie Dickens spent a considerable time at a place referred to in the testimony as the Turner cabin, in the town of Alturas; that while they were at the Turner cabin, the deceased and the two Indian girls managed to consume a bottle of rubbing alcohol which the deceased brought with him to the Turner cabin; that the three remained in the Turner cabin until about 1 o'clock of the following morning, playing cards and drinking the alcohol referred to; that at about 1 A. M. on the seventeenth day of February, 1928, the deceased and the two Indian girls left the Turner cabin and went to the railroad car occupied by the deceased, as hereinbefore referred to, upon the request of the deceased and upon his statement that he had some more liquor there; that upon reaching the railroad car, the deceased produced a gallon jug of liquor mentioned in the testimony as "Jackass Whiskey" and "Jackass Brandy," and from this all three of the parties drank more or less, the deceased drinking until he became drunken. At about 2:30 A. M. the Indian girl named Dressie Dickens left the railroad car and went home. The deceased and the defendant remained in the car, and when the witness named Dressie Dickens departed therefrom, were sitting on a bed, apparently friendly. From this time on, as to what occurred depends entirely upon the testimony of the defendant, and occurred while both of the parties in the car were in an intoxicated condition. From the testimony of the

appellant it appears that the trouble began over the subject of marriage between the deceased and the defendant, and as it appears in the record, is substantially as follows: The deceased having asked the defendant to marry him in the morning, and the defendant having replied, "Have you forgotten our agreement that we are to get married the first of March?" The deceased then said, "If you don't marry me to-morrow, I will kill you and then myself," the defendant answering, "Don't you remember we promised to get married the first of March? I'll bet you're drunk." The deceased replied, "You bet your —— life I'm drunk." At this instant of time the deceased became angry and walked over to the corner of the car to a small closet and took therefrom a 30-30 Winchester rifle, manipulated it as in the act of loading, took it over to where the defendant was sitting, and placed it in her hands. After placing the rifle in the hands of the defendant, the deceased took a pocket knife from his pocket and opened a long sharp blade and sat down on the bed directly in front of the defendant, not over six feet distant, and then told the defendant to kill him, otherwise, he would kill her and himself, to which the defendant replied, "I don't want to kill you, Bob, and I don't want to die, either. Please don't make me do it." Again the deceased repeated his command to the defendant, and held the open pocket knife in his right hand in a menacing manner, and stated, "You kill me, or I'll kill you and then myself." Again the defendant declined to fire, and deceased further said, "Well, are you going to shoot?" He then raised the open pocket knife in his right hand and repeated for the third time, "Are you going to shoot? If you don't, I'll kill you and myself," at which time the defendant, fearing for her own life and bodily safety, fired the fatal shot. Testimony of the defendant was further to the effect that she acted under the belief that she was in great bodily peril, and that the deceased was about to execute his threat by killing her with the knife. In support of this, testimony was introduced to the effect that the deceased was skilful in throwing knives; that the defendant had seen him so doing; and, further, that the deceased had, at some time previously, in the county of Elko, Nevada, been arrested and pleaded guilty to the charge of assault with a deadly weapon, with intent to inflict great bodily harm, etc.

The only evidence in the record which might tend to contradict that of the defendant was to the effect that on the following day, or shortly thereafter, the defendant, upon being interrogated, stated that the deceased was killed by a Mexican called the "Chief," and, also, with reference to what was stated in a letter written by the defendant after the occurrences, in which she stated that she had shot the deceased, and that what she wrote to that effect was at the request of a certain Mrs. Beck, Mrs. Beck testifying that she did not tell the defendant what to write in the letter referred to.

The record shows, as the foregoing summary indicates, that the only question to be decided by the jury was whether the defendant acted in necessary self-defense, or whether the circumstances were such as to justify a reasonable person in so acting. To aid the jury in answering this question, the court gave the jury, among others, the following instructions:

"Instruction No. 8.

"You are instructed, lady and gentlemen of the jury, that the defendant in this case has sought to justify the killing of Robert DeClute, by attempting to show that she acted in self-defense.

"You are further instructed that the burden of proving justification is upon the defendant.

"Instruction No. 9.

"You are instructed, members of the jury, that to justify the commission of a homicide in self-defense, there must exist a necessity, actual or apparent. The danger must appear to the person assailed to be so urgent and pressing that in order to save his own life or to prevent his receiving great bodily harm, the killing of his assailant is absolutely, or at least reasonably necessary. A defendant may not justify the taking of human life upon the belief that danger is about to become imminent, or that it will in the future become imminent; it is not enough that there should exist in the mind of the defendant a belief that he is in actual peril. It must appear that he believed himself in such peril, but that, as a reasonable person, he had sufficient grounds for his belief. The killing must be done under an honest and well founded belief, that it is necessary for the party killing, to take the life of the deceased at that time,

to save himself from great bodily harm. If the circumstances as they appear to the defendant, would have induced a reasonable man, so situated, to believe that there was a reasonable mode available to him to escape from danger of death or great bodily harm, the danger thereof would not then be imminent, and the killing would not be justifiable. It is for the jury to determine whether, as a reasonable man, the defendant was justified in believing himself in danger."

"Instruction No. 12.

"The court instructs you that the duty of the defendant to flee rather than to kill, if retreat is possible, only applies where the defendant is the assailant; but when a defendant who is himself without fault, is suddenly attacked in a way that puts his life or bodily safety at imminent hazard, he is not compelled to fly (flee) or to consider the proposition of flying (fleeing), but may stand his ground and defend himself to the extent of taking the life of the assailant, if that be reasonably necessary."

 While there is some doubt as to the state of the record concerning the giving of instruction number 8, whether it was consented to by counsel for the defendant, we are satisfied that the record is in such condition that the defendant is not bound by anything that appears therein. This instruction appears to have been given on the theory that section 1105 of the Penal Code, which reads as follows: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable," is applicable where an information or indictment charges manslaughter. This, however, is not the law. The section applies only where murder is charged, and the circumstances do not show any mitigating or justifying facts. The rule is aptly stated in 13 California Jurisprudence, page 736: "If the proof on the part of the prosecution tends to show that the homicide amounts only to manslaughter, or that it was justifiable or excusable, then no burden is placed on defendant to prove any circumstances or mitigation or that justify or excuse it." Here, the charge against the defendant is that of manslaughter

only, and the burden of proof is not shifted. The trial court in the instant case did not give to the jury that portion of section 1105 of the Penal Code which would have informed the jury that it applied only to cases where the defendant was on trial for the crime of murder, but omitting such portion of the section, the court directly charged the jury that the burden of proof rested upon the defendant. To show the prejudicial character of this instruction, we have only to set forth a short excerpt taken from the concluding argument of the district attorney, to wit: ''So, after we have presented the proof to you that the defendant Cassie Turner, killed Robert De Clute by shooting him with a rifle, the burden has shifted to the defense to show why she killed him, or if she had any justification whatever for taking this human life. She must show you, by a preponderance of the evidence, that she killed this man in self-defense.''

Section 1105 of the Penal Code has been considered a number of times both by the supreme court and district court of appeal, and the holding in all of the cases is to the effect that the burden does not shift when the testimony introduced on the part of the People shows that the offense amounts only to manslaughter, or that there are mitigating or justifying circumstances, and, also, that when the testimony introduced on the part of the prosecution shows that the offense amounts only to manslaughter, section 1105 of the Penal Code is inapplicable and should not be given even though in some of the cases the giving of the instruction is held not to be erroneous. There is no California case holding that when a defendant is charged only with manslaughter, the burden of proof rests upon the defendant. Such is not the meaning of the section, as we interpret it, and the giving of the instruction in this case we think prejudicial error.

Again, in instruction number 9, we find the following sentence: ''If the circumstances, as they appear to the defendant, would have induced a reasonable man so situated, to believe that there was a reasonable mode available to him to escape from danger of death or great bodily harm, the danger thereof would not then be imminent and the killing would not be justifiable.'' While in some states this rule is followed, the modern trend is to the contrary, and the

exact opposite is the law in the state of California. (13 Cal. Jur., p. 649, sec. 49.)

In the case of *People* v. *Maughs,* 149 Cal. 253 [86 Pac. 187], an almost identical instruction was given to the jury, and in an elaborate opinion the supreme court, in the Maughs case, held the giving of such instruction prejudicial error, and further held that the giving of an instruction, as we find in instruction number 12 in this case, not sufficient to cure the error. The court, in considering the subsequent instruction given in the Maughs case as to the nonnecessity of retreating, used the following language: ''Nor is it any answer to this objection that the court elsewhere gave a correct instruction upon the subject. The result served but to confuse the jury and to render it impossible to determine whether, in their deliberations, they followed the law as correctly or as incorrectly set before them.'' (Citing *People* v. *Campbell,* 30 Cal. 312, *People* v. *Anderson,* 44 Cal. 65, *People* v. *Wong, etc.,* 54 Cal. 151 [35 Am. Rep. 69] , *People* v. *Messersmith,* 57 Cal. 757, *People* v. *Thompson,* 92 Cal. 506 [28 Pac. 589] , and *People* v. *Pearne,* 118 Cal. 154 [50 Pac. 376].) The further objection that the language which we have just quoted from instruction number 9 is indefinite and uncertain as to its meaning, we also think well taken. Just what is ''the reasonable mode available to him to escape from danger of death, etc.,'' is not specified. Was it by retreating, or was it by using other available means to repel the threatened assault of the deceased, such as by striking him over the head with the rifle instead of discharging the load therein contained? We conclude that it means that the defendant should have retreated, if possible, which, of course, is not a correct statement of the law.

The arriving at a conclusion in this cause necessarily depending upon the interpretation and credibility to be given to the testimony of the defendant, as she was the sole witness to the affair, it follows that there is no room for the application of section 4½ of article VI of the constitution. Upon the record, the testimony would as readily lead to the conclusion that the defendant was justified, as to the conclusion that she was not. While the words used by the deceased, taken alone, were not sufficient to justify the acts of the defendant; yet, in view of the threats of the

deceased, when coupled with his acts, such as the raised right arm with the hand grasping an open knife, indicating a present purpose and ability to inflict great bodily harm, we find a situation presented which precludes our holding that the evidence was such that the jury could not have been influenced by the erroneous instructions casting the burden of proof upon the defendant, even though we were to hold that the jury may not have been misled by the conflicting instructions as to the defendant's duty to retreat. The fact that the acts of the deceased were being impelled by a thought inflamed with the poison of jackass brandy, also presents an added peril which we cannot overlook in passing upon the probable effects of the erroneous instructions. The errors being prejudicial, the judgment cannot be sustained. It therefore follows that the order and judgment appealed from must be, and the same are hereby, reversed.

Finch, P. J., and Hart, J., concurred.