[Crim. No. 1799. Third Dist. Dec. 23, 1942.]

THE PEOPLE, Respondent, v. MAURICE ZUCKERMAN, Appellant.

C. P. Rendon, E. P. Foltz and John J. Taaffe for Appellant.

Earl Warren, Attorney General, and J. Q. Brown, Deputy Attorney General, for Respondent.

THOMPSON, J.—The defendant was charged with the murder of Otto Dander. He was convicted of manslaughter. A motion for new trial was denied. From the judgment of conviction and from the order denying a new trial this appeal was perfected.

The appellant contends that the verdict and judgment are not supported by the evidence, and that the court erred in giving to the jury and in refusing to give certain instructions regarding the right of one who is assailed, to stand his ground and use a deadly weapon, if it appears to be necessary in defense of himself, without first "retreating to the wall." It is also asserted the district attorney was guilty of prejudicial misconduct which prevented a fair trial.

The defendant is a resident of Stockton, where he has lived for many years. He possessed a previous good reputation as a peaceable citizen. He was engaged in farming on a large scale. He also maintained a place of business in Stockton. At the time of the homicide he was a deputy sheriff and was therefore authorized to and did carry a revolver. He was 63 years of age, weighed 180 pounds and was 5 feet 6 inches tall. He was afflicted with heart disease. He had been intimately acquainted for twenty-five years with Mr. Podmore, a produce merchant who resides in Honolulu. Podmore flew

from the Hawaiian Islands arriving at Sacramento, November 10, 1941. The following day he went to Stockton to visit with Mr. Zuckerman. After several hours of association they drove to "Matty's Night Club" in Stockton, where they arrived about three o'clock in the afternoon. The night club contained a cocktail lounge equipped with bar and stools for the accommodation of customers, together with an automatic slot musical device which furnished music for dancing and other equipment.

The defendant and his friend seated themselves at the southerly end of the bar and drank two or three cocktails. After about an hour had elapsed a party consisting of Otto Dander (the deceased), his wife Hazel, her sister Mrs. Brandt, Ernest Dander, brother of Otto Dander, and Dr. Scarles entered the night club. They were all residents of Stockton and bore good reputations. Otto Dander was 40 years of age, weighed 160 pounds, and was of average height. His brother Ernest was 43 years old, weighed 186 pounds and was 5 feet 10 inches tall. The Dander brothers were engaged in farming. Both of them were vigorous and strong. It does not appear how well acquainted they were with the defendant, but there is no evidence of previous trouble between them. The members of the Dander party seated themselves at the northerly end of the bar and ordered refreshments.

The music began and Podmore, who appeared to be intoxicated, without a previous introduction asked Mrs. Brandt to dance with him. She accepted the invitation. Podmore was persistent in his attentions to Mrs. Brandt. She afterwards stated that he became unduly familiar by trying to place his face against her cheek. Nothing was said to him regarding that incident, but when the music ceased she immediately returned to her seat at the bar. When the music again started Podmore returned and asked Mrs. Brandt to dance with him. She excused herself, stating she was going to dance with her sister, Mrs. Otto Dander. The ladies began to dance together. Podmore followed them a short distance and attempted to "cut in" on their dancing by placing his extended arms between them in an attempt to separate them. Otto Dander, who had been watching the conduct of Podmore, left his seat at the bar and rushed over to where they then stood, jerking him around and shoving him away from the ladies, saying, "leave the girls alone, they don't want to

dance with you,'' or words to that effect, Podmore raised an arm either as a threat or to guard against an unexpected blow. Otto Dander struck him with a powerful blow and knocked him senseless to the floor. He remained unconscious for more than an hour.

During the previously-mentioned affray the defendant sat at the bar talking with two women. Hearing the disturbance he turned around and seeing that his friend Podmore had been knocked to the floor, he rushed over to the group, saying to Otto Dander ''You can't do that to my friend.'' Otto assumed a hostile attitude and Zuckerman then struck him in the face, knocking him back among the stools or possibly to the floor. Dander was injured to some extent. He returned wiping the blood from his face. In the meantime his brother Ernest hastened to the rescue of Otto. He struck Zuckerman and knocked him down. The defendant immediately got up and said ''What did you hit my friend for?'' Hostilities appeared to have ceased. Several witnesses so stated. Two bartenders came forward to remove the prostrate form of Mr. Podmore. He was still unconscious. The participants in the affray were standing in that vicinity. The defendant claims to have examined his friend to see how badly he was injured. He said that he thought Podmore was dead. As the bartenders picked him up to take him into a back room, Mr. Zuckerman started toward the bar claiming that he was going for his hat to follow the body of his friend, and render whatever aid he could. He was met by Otto Dander and the fight between them was renewed with great vigor. It is difficult to determine who the aggressor was in this second affray. Ernest Dander immediately rushed to the spot. Otto struck Zuckerman a terrific blow, which one witness called a ''haymaker,'' and knocked him flat upon his back. The defendant's cheek was so badly cut that it bled profusely and required medical attention. As he lay upon the floor Otto Dander stood facing him in a hostile attitude about five feet distant. He was very angry. His brother Ernest also stood by his side. After lying on the floor for an instant, Zuckerman clambered to his feet, drawing his revolver as he arose. He claimed that he actually thought the Dander brothers were going to kill him. He said that Otto followed him and told him ''We are going to knock your brains out, you s-of-a-b.'' The defendant declared that as he arose Otto stood facing him at a distance of four or five feet, and that his face ''was that

of a madman,'' and that Otto promptly raised his hands and took a step toward him, as though he intended to renew the attack. He said that he pulled his revolver as he got upon his feet, thinking it might frighten his assailants enough to prevent them from attacking him again. He claimed that he did not intend to shoot either of them, but as Otto confronted him and stepped toward him he thought ''The man's going to kill me surely,'' and not knowing what else to do he fired and shot Otto Dander through the stomach. Otto died as a result of that shot. Great commotion ensued in the barroom. Zuckerman was not further molested. He took his hat and left the resort through the front entrance. He was later arrested and charged with the murder of Otto Dander. He was convicted of manslaughter.

The judgment of conviction is adequately supported by the record. The evidence is conflicting. It was the sole province of the jury under proper instructions to determine whether the defendant shot and killed Otto Dander in necessary self-defense. After the first conflict over the knocking down of Podmore, there was a cessation of the combat. Several witnesses said they thought the fight was then finished. The defendant made no effort, as a deputy sheriff or otherwise, to arrest either of the Dander brothers for their assault upon Podmore during that first episode. There is no conflict of evidence regarding the fact that his interference in that affair was solely for the purpose of punishing the assailants of his friend Podmore, or to render him assistance, and not to make an arrest as a peace officer.

The evidence is conflicting upon the question as to who the aggressor was in the second affray. The defendant testified in effect that after the first combat he was going for his hat to accompany the bartenders who were removing the form of his companion, for the purpose of rendering aid to him; that he was intercepted or followed by Otto Dander who, without provocation, threatened to knock his brains out, and who did actually strike him twice and knock him down, inflicting a serious injury upon him; that he protested against the assault, saying that he had heart disease and that they would kill him if they hit him again; that when he arose he was confronted by both brothers, one of whom stood facing him at a distance of about five feet, looking like a madman, and that Otto then raised his hands and advanced toward him in a threatening manner; that both assailants were comparatively young, active and power-

ful; that he was then suffering from acute heart disease and he therefore believed he was about to be seriously injured or killed when he fired and shot Otto Dander. The defendant did further state that he drew his revolver for the first time as he arose from the floor, not intending to shoot either of the Dander brothers, but thinking it might deter them from renewing their attack upon him, and that the forward step of Otto Dander brought him in direct range of the fatal bullet. We do not pretend to say these statements are all true. That was a question for the jury to decide. But the statements do constitute substantial evidence raising the issue as to whether the defendant was reasonably justified in believing, under the circumstances existing, that he was about to be seriously injured or killed by his assailants and that it was therefore necessary to shoot and kill Otto Dander in self-defense. That was an issue which the defendant had a right to have submitted to the jury under proper instructions. It is immaterial whether Zuckerman shot to kill or only to frighten his adversary.

In spite of the foregoing important issue, the court inadvertently instructed the jury, in effect, that it was the duty of the defendant under the circumstances of this case to flee from the scene and to ''retreat to the wall'' before he would be justified in using a deadly weapon even in self-defense. The court further instructed the jury that one who was assailed might be excused from retreating or fleeing only when he was attacked with a *''weapon . . .* of such a character that retreat might well increase his peril.'' This last statement is peculiarly prejudicial in this case because Otto Dander was not armed with a weapon, and the jury may therefore have believed that since the defendant's assailant did not attack him *with a weapon,* it was Zuckerman's duty to flee and retreat to the wall before he would be permitted to use a deadly weapon even in self-defense. The challenged instruction, which was given to the jury, reads as follows:

''The defendant is not necessarily justified, because he actually believed that he was in imminent danger. When the danger is only apparent, and not actual and real, the question is: Would a reasonable man, under all the circumstances, be justified in such belief? If so, the defendant will be so justified if he in fact had such belief.

''If this was defendant's position, it was his right to repel the aggression and fully protect himself from such apparent

danger. *If he could have withdrawn from the danger, it was his duty to retreat. Between his duty to flee and his right to kill, he must flee; or, as the books have it, must retreat to the wall, but by this is not meant that a party must always flee, or even attempt flight. The circumstances of the attack may be such, the weapon if any, with which he is menaced of such a character that retreat might well increase his peril. By 'retreating to the wall' is only meant that the party must have availed himself of any apparent and reasonable avenues of escape by which his danger might be averted, and the necessity of slaying his assailant avoided.''*

It is our opinion this instruction was erroneous and highly prejudicial. The jury was not elsewhere instructed on the subject of the necessity of a defendant to retreat to the wall before he may be justified in resorting to a deadly weapon in self-defense. The jury was elsewhere correctly instructed regarding the general principles of self-defense. But that does not overcome the prejudicial influence of the foregoing erroneous charge. The Supreme Court said in *People* v. *Maughs,* 149 Cal. 253 [86 P.187], at page 261, in that regard:

''Nor is it any answer to this objection that the court elsewhere gave a correct instruction *upon the subject.* The result served but to confuse the jury and to render it impossible to determine whether in their deliberations they followed the law as correctly or as incorrectly set before them.'' (Italics ours.) (Citing several authorities.)

The defendant's objection to the prejudicial character of the foregoing challenged instruction was fortified by his offer of four other instructions, numbered 90, 91, 92 and 123, to the effect that when a defendant, acting as a reasonable person under the particular circumstances of the case, is justified in believing that he is about to receive great bodily harm, or that he will be killed by his assailant, he has a right to stand his ground and use all necessary force, even to the extent of resorting to a deadly weapon, and be excused from the homicide which results therefrom, on the ground of self-defense. These instructions were all refused. ██ We are of the opinion instruction number 92 was a correct statement of the law. It reads:

''You are further instructed that if you find from the evidence that the defendant in repelling an assault by either or both of the Danders made upon him [the defendant], the defendant as a reasonable man was justified in believing that

either or both of the Danders intended to inflict serious injury upon him, the defendant, the defendant had a right in defense of his person to use all force necessary to repel the assault upon him, even to the taking of the life of either or both of the Danders.''

It has been held to constitute error for the trial court to refuse to give to the jury instructions similar to the preceding rejected one regarding the right of a person who is assailed to stand his ground and to use all necessary force to repel the attack, where there is a conflict of evidence regarding the question of self-defense. (*People* v. *Newcomer,* 118 Cal. 263, 271 [50 P. 405] ; *People* v. *Orosco,* 73 Cal.App. 580, 598 [239 P. 82] ; *People* v. *Kinowaki,* 39 Cal.App.2d 376 [103 P.2d 203].) In the case last cited it is said:

''The requested instruction was applicable to the testimony given by the witnesses for the defense and in view of the marked conflict in the testimony of the various witnesses, it cannot be held that defendants were not prejudiced by the failure of the court to give it.''

That is the precise effect in the present case. The California courts have definitely rejected the antiquated doctrine that a defendant will be justified in killing his assailant in self-defense only after he has used every possible means of escape by fleeing, even to the extent of ''retreating to the wall,'' regardless of whether the imminent peril would justify him as a reasonable person in believing he was about to receive great bodily harm, or that he was likely to be killed if he did not promptly resort to a deadly weapon. (*People* v. *Maughs, supra; People* v. *Hecker,* 109 Cal. 451 [42 P. 307, 30 L.R.A. 403] ; *People* v. *Gonzales,* 71 Cal. 569 [12 P. 783] ; *People* v. *Turner,* 93 Cal. App. 133 [269 P. 204] ; *People* v. *Estrada,* 60 Cal.App. 477 [213 P. 67] ; *People* v. *McDonnell,* 32 Cal.App. 694 [163 P. 1046] ; 13 Cal.Jur. 649, sec. 49; 18 A.L.R. 1279-1291, note.)

In the elaborate note on the subject of the right of one who is assailed to stand his ground when, as a reasonable person, he believes he is in imminent danger of great bodily harm, the headings which are supported by numerous authorities from most of the jurisdictions of the United States, including California, found on pages 1283 and 1291 of 18 A.L.R., read as follows:

''(III) Where, from the nature of the attack, the assailed person believes, on reasonable grounds, that he is in imminent

danger of losing his life or of receiving great bodily harm from his assailant, he is not bound to retreat, but may stand his ground, and, if necessary for his own protection, may take the life of his adversary.''

'' (VII) The doctrine of the common law that the right of self-defense did not arise until the assailed person had 're-treated to the wall' has been supplanted, in some of the juris-dictions, by the doctrine that if the person assailed is without fault, and in a place where he has a right to be, and put in rea-sonably apparent danger of losing his life or receiving great bodily harm, he need not retreat, but may stand his ground, repel force by force, and if, in the reasonable exercise of his right of self-defense, he kills his assailant, he is justified.''

 In the present case, the question of whether the defen-dant was without fault in the last affray, was a problem for the determination of the jury, even though there may be a conflict of evidence in that regard. The challenged instruction was therefore erroneously given to the jury.

In view of the necessity of reversing the judgment for the reasons above stated, it will serve no useful purpose to review the numerous other grounds upon which the defendant urges a reversal.

The judgment and the order are reversed.

Schottky, J. pro tem., and Adams, P. J., concurred.